FOURTH DIVISION

September 29, 2005

1-04-0448 and 1-04-0450 (Consolidated)

MARGUERITE FORSYTHE, Individually and )   Appeal from the

as Special Administrator of the Estate )   Circuit Court of

of Michael F. Forsythe, Deceased, )   Cook County.

)

Plaintiff-Appellant, )

)

v. )

)

CLARK USA, INC., a Delaware Corporation,)

)

Defendant-Appellee. )

)

________________________________________)

)

ELIZABETH M. SZABLA, as Special )

Administrator of the Estate of Gary )

Szabala, Deceased, )

)

Plaintiff-Appellant, )

)

v. )

)

CLARK USA, INC., a Delaware Corporation,)   The Honorable

)   Carol Pearce McCarthy

Defendant-Appellee. )   Judge Presiding.

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Plaintiffs Marguerite Forsythe, individually and as special administrator to the estate of her late husband, Michael F. Forsythe, and Elizabeth M. Szabala, special administrator of the estate of  Gary Szabala, appeal from the judgement of the circuit court granting summary judgment to defendant Clark USA, Inc., pursuant to section 2-1005 of the Code of Civil Procedure (735 ILCS 5/2-1005 (West 2002)).  On appeal, plaintiffs argue that because defendant owed a duty to the deceased, and because genuine issues exist as to whether defendant breached that duty and proximately caused their deaths, the circuit court erred in granting summary judgment for defendant.  For the following reasons, we reverse the judgment of the circuit court and remand this cause for further proceedings.

BACKGROUND

Decedents Michael F. Forsythe and Gary Szabala were employed as maintenance mechanics for Clark Refining & Marketing, Inc. (Clark Refining), which operated an oil refinery in Blue Island, Illinois.  On March 13, 1995, the decedents were killed when a fire erupted at the refinery while they were on their lunch break.  The fire was apparently caused by other Clark Refining employees who attempted to replace a four-inch valve on an operating unit known as the Isomax without ensuring that flammable materials within the pipe had been depressurized.  According to plaintiffs, those employees were not maintenance mechanics and not trained or qualified to work on the Isomax.
  After Clark Refining paid the estate of each decedent pursuant to the Workers' Compensation Act (820 ILCS 305/1 
et seq
. (2002)), plaintiffs brought a wrongful death suit against defendant, Clark Refining's sole shareholder.
(footnote: 1)  

According to their complaints, plaintiffs alleged that defendant had developed an "overall business strategy" for Clark Refining which "focused on minimizing operating costs and limiting capital expenditures" in order to increase revenue for its parent corporation, the Horsham Corporation.  Plaintiffs alleged that defendant "had a duty to use reasonable care in imposing its overall business strategy on [Clark Refining] so as not to create an unreasonable risk of harm to others," but breached that duty by (1) "requiring [Clark Refining] to minimize operating costs including costs for training, maintenance, supervision and safety," (2) "requiring [Clark Refining] to limit capital investments to those which would generate cash for the refinery thereby preventing [Clark Refining] from adequately reinforcing the walls of the lunch room or relocating the lunch room to a safe position within the refinery," and (3) "failing to adequately evaluate the safety and training procedures in place at the Blue Island Refinery."  As a result of defendant's overall business strategy of capital cutbacks, Clark Refining was required to have unqualified employees act as maintenance mechanics, whose inexperience resulted in the refinery fire which killed the decedents.  Thus, plaintiffs alleged that defendant's overall business strategy was a proximate cause of the fire.  

Filing a motion for summary judgment, defendant argued that, as a mere holding company whose only connection to Clark Refining was its status as sole shareholder, it owed no duty to either deceased.  In support of its motion, defendant submitted numerous depositions and documents showing that its subsidiary Clark Refining owned and operated the refinery, and that it had no control over the day-to-day operations.  

Plaintiffs responded that despite defendant's legal status in relation to Clark Refining, defendant was directly responsible for creating conditions in which such a fire could occur. Specifically, plaintiffs alleged that defendant's "overall business strategy" for Clark Refining resulted in a series of cutbacks at the Blue Island refinery that undermined safety, training, and maintenance there and, in turn, created an unreasonable risk of harm to others including the employees of Clark Refining.  

To support their arguments, plaintiffs relied on evidence that defendant's directors drew up and approved Clark Refining's budget; the boards of both defendant and Clark Refining often met simultaneously; according to defendant's 1995 strategic business plan, defendant mandated that Clark Refining "position itself as a low cost refiner and marketer"; and defendant strove to "replenish the strategic cash reserve [of defendant] to $200 million" by "decreas[ing] capital spending *** to minimum sustainable levels" and instituting a "survival mode" philosophy to its 1995 business plan.  

Plaintiffs further relied on evidence that while Clark Refining employees prepared its budget for 1995 expenditures, Paul Melnuk, who was both president of defendant and chief executive officer of Clark Refining, instructed those employees to reduce the budget by 25%.  As a result, Clark Refining was forced to cut back on its maintenance department staff and cancel its training program for new operators, causing both a deterioration of the infrastructure at the refinery (as evidenced by a number of citations from the Occupational Safety and Health Administration for rules infractions including several related to the maintenance of the Isomax) and an overload of work on the undermanned maintenance staff. 

Without explaining its reasoning, the circuit court granted summary judgment to defendant.  Plaintiffs then filed separate notices of appeal, which we consolidated for review.

ANALYSIS

      We begin our analysis by noting that summary judgement is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  735 ILCS 5/2-1005(c) (West 2002).  The purpose of summary judgment is not to try a question of fact, but to determine if one exists (
Golden Rule Insurance Co. v. Schwartz
, 203 Ill. 2d 456, 462 (2003)), and we review an order granting summary judgment 
de novo
 (
Morris v. Margulis
, 197 Ill. 2d 28, 35 (2001)).

I.  PLAINTIFFS' NEGLIGENCE CLAIM

In order to sustain a cause of action for negligence, a plaintiff must show that the defendant owed him a duty of care, breached that duty, and proximately caused his injuries.  See 
Bonner v. City of Chicago
, 334 Ill. App. 3d 481 (2002).  Unless a plaintiff demonstrates that a duty is owed, there can be no negligence imposed upon the defendant.  
American National Bank & Trust Co. of Chicago v. National Advertising Co.
, 149 Ill. 2d 14, 26 (1992).  There are four factors courts use to determine whether a duty exists:  (1) the reasonable foreseeability of injury, (2) the likelihood of injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing the burden upon the defendant.  See 
Sollami v. Eaton
, 201 Ill. 2d 1, 17 (2002); 
Jones v. Chicago HMO Ltd. of Illinois
, 191 Ill. 2d 278, 303 (2000).  
Whether a duty exists is a question of law that may be decided on a motion for summary judgment.  See 
Sandoval v. City of Chicago
, 357 Ill. App. 3d 1023, 1027 (2005).

Under Illinois law, a corporation is deemed a distinct legal entity, separate from other corporations with which it may be affiliated.  See 
Daley v. American Drug Stores, Inc.
, 294 Ill. App. 3d 1024, 1027 (1998).  Generally, a corporation as a legal entity exists separately from its shareholders, directors, and officers, who are not ordinarily liable for the corporations's liabilities.  
Jacobson v. Buffalo Rock Shooters Supply, Inc.
, 278 Ill. App. 3d 1084, 1088 (1996).  Where a corporation is the sole shareholder of another corporation (as defendant was here), the general rule is that the shareholder-corporation is not liable for the conduct of its subsidiary unless the corporate veil can be pierced.  See 
Esmark, Inc. v. National Labor Relations Board
, 887 F.2d 739, 753 (7th
 Cir. 
1989) ("[T]he general rule is that a shareholder is not liable for the obligations of a corporation unless the shareholder exercised 'complete domination' over the corporation's decisionmaking, treating the corporation as a 'mere instrumentality' or 'alter ego' to advance the shareholder's personal interests. [Citations].  Thus, in general, a parent corporation may not be held to account for the liabilities of a subsidiary unless the legal separateness of parent and subsidiary has been disregarded in a wide range of corporate matters"); see also
 
Cosgood Distributors, Inc. v. Haff
, 343 Ill. App. 3d 426, 428-29 (2003) (discussing the factors courts use to determine whether to pierce the corporate veil)
.

Defendant rests its "no duty owed" argument solely upon its status "as [Clark Refining's] sole shareholder, or on its status as intermediate holding company between [Clark Refining] and the ultimate parent Horsham."  Citing the rule that corporations are distinct legal entities, and extolling the fact that plaintiffs have foresworn any attempt to pierce the veil between it and Clark Refining, defendant contends that it owed no duty to either decedent.  

There is, however, a well-established though seldom employed exception to "the general rule that the corporate veil will not be pierced in the absence of large-scale disregard of the separate existence of a subsidiary corporation"; that exception being "direct participant" liability.  See 
Esmark
, 887 F.2d at 755.
  
"Although not often employed to hold parent corporations liable for the acts of subsidiaries in the absence of other hallmarks of overall integration of the two operations, it has long been acknowledged that parents may be 'directly' liable for their subsidiaries' actions when the 'alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management,' and the parent has interfered with the subsidiary's operations in a way that surpasses the control exercised by a parent as an incident of ownership."  
Pearson v. Component Technology Corp.
, 247 F.3d 471, 486-87 (3rd Cir. 2001), quoting 
United States v. Bestfoods
, 524 U.S. 51, 64, 141 L. Ed. 2d 43, 58
, 118 S. Ct. 1876, 1886 (1998), quoting W. Douglas & C. Shanks, 
Insulation From Liability Through Subsidiary Corporations
, 39 Yale L.J. 193, 207 (1929); see also 
Consolidated Rock Products Co. v. Du Bois
, 312 U.S. 510, 524, 85 L. Ed. 982, 992-93, 61 S. Ct. 675, 684 (1941)
 ("[I]t is well settled that where a holding company directly intervenes in the management of its subsidiaries so as to treat them as mere departments of its own enterprise, it is responsible for the obligations of those subsidiaries incurred or arising during its management. [Citations.] ***  A holding company which assumes to treat the properties of its subsidiaries as its own cannot take the benefits of direct management without the burdens")
.  

Though we could not find, nor did the parties cite, any Illinois court addressing this exception, there is strong support for recognizing such liability.  
In 
Esmark
, where the National Labor Relations Board found a parent corporation liable for the unfair labor practices of its subsidiaries, not on the basis of the "alter ego" or "corporate veil piercing" doctrines, but instead as a " 'direct  participant' " in those practices, the Seventh Circuit provided an extensive discussion of this exception.  See 
Esmark
, 887 F.2d at 755.  

Quoting an article co-written by former United States Supreme Court Justice (but then-Professor) William O. Douglas, Justice Cudahy noted that such "direct liability" was possible even where veil piercing was not:

"Writing in 1929, then-Professor William O. Douglas counseled that four actions would generally insure that a parent corporation would not be held liable for its subsidiaries' wrongdoing:

'(1) A separate financial unit should be set up and maintained.  That unit should be sufficiently financed so as to carry the normal strains upon it. *** (2) The day to day business of the two units should be kept separate. *** (3) The formal barriers between the two management structures should be maintained.  The ritual of separate meetings should be religiously observed. *** (4) The two units should not be represented as being one unit.'

Douglas and Shanks, 
Insulation from Liability through Subsidiary Corporations
, 39 Yale L.J. 193, 196-97 (1929).  So far as appears from the record here, Esmark followed the four steps recommended by Justice Douglas to avoid liability for its subsidiaries' obligations.  However, Douglas also noted that '[t]here is a group of cases where liability is imposed upon the parent for torts of the subsidiary, even though the four standards of organization and operation which have been discussed above are *** met.' 
Id. 
at 205.  As an example, Justice Douglas noted that liabilty has been imposed in 

instances where the parent is 
directly a participant 
in the wrong complained of.  The parent has been held liable in a tort action for inducing the subsidiary by means of its stock ownership to breach a contract with the plaintiff.  Stock ownership was not enough.  But the use of the latent power incident to stock ownership to accomplish a specific result made the parent a participator in or doer of the act.  Again, there was interference in the internal management of the subsidiary; an overriding of the discretion of the managers of the subsidiary.'

Id. 
at 208-09 (footnote omitted)(emphasis added)." 
 Esmark
, 887 F.2d at 755.   

Quoting the same article, the Seventh Circuit recounted Douglas' acknowledgment that such "direct participation" liability arises from the "'[d]irect intervention or intermeddling by the parent in the affairs of the subsidiary and more particularly in the transaction involved, to the disregard of the normal and orderly procedure of corporate control carried out through the election of the desired directors and officers of the subsidiary and the handling by them of the direction of its affairs.'"  
Esmark
, 887 F.2d at 755, quoting 39 Yale L.J. at 218.

The Seventh Circuit went on to cite Judge Learned Hand, 

who "similarly recognized that a parent corporation 

could be held liable for the actions of its subsidiaries where the parent directly supervised the conduct of 

a specific transaction[:]

'Control through the ownership of shares does not fuse the corporations, even when the directors are common to each.  One corporation may, however, become an actor in a given transaction, or in part of a business, or in a whole business, and, when it has, will be legally responsible.  To become so it must take immediate direction of the transaction through its officers, by whom alone it can act at all. *** [L]iability ordinarily must depend upon the parent's direct intervention in the transaction, ignoring the subsidiary's paraphernalia of incorporation, directors and officers.  The test is therefore rather in the form than in the substance of the control; in whether it is exercised immediately, or by means of a board of directors and officers, left to their own initiative and responsibility in respect of each transaction as it arises.'" 
Esmark
, 887 F.2d at 755-56, quoting 
Kingston Dry Dock Co. Lake Champlain Transportation Co.
, 31 F.2d 265, 267 (2d Cir. 1929).

Thus, the Seventh Circuit found that "[u]nder this 'transaction- specific' theory of direct participation," a "parent corporation may be held liable for the wrongdoing of a subsidiary where the parent directly participated in the subsidiary's unlawful actions."  
Esmark
, 887 F.2d at 756.    

In 
Bestfoods
, the United States Supreme Court also recognized this notion of "direct participant" liability:

"As Justice (then-Professor) Douglas noted almost 70 years ago, derivative liability cases [
i.e.
, corporate veil piercing cases] are to be distinguished from those in which 'the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management' and 'the parent is directly a participant in the wrong complained of.'  Douglas 207, 208. In such instances, the parent is directly liable for its own actions.  See H. Henn & J. Alexander, Laws of Corporations 347 (3d ed. 1983) *** ('Apart from corporation law principles, a shareholder, whether a natural person or a corporation, may be liable on the ground that such shareholder's activity resulted in 

the liability')."  
Bestfoods
, 524 U.S. 51, 64-65, 141 

L. Ed. 2d 43, 58, 
118 S. Ct. 1876, 1886,(1998).

Plaintiffs here alleged that defendant was a proximate cause of the decedent's deaths via its own direct conduct, 
i.e.
, by mandating that Clark Refinery operate the refinery at "survival mode" and by reducing the capital expenditures to the "minimum sustainable level," defendant created conditions within the refinery which posed an unreasonable risk of harm to refinery employees like the decedents.  In other words, by mandating how Clark Refining was to operate the Blue Island refinery (at a 25% cost reduction), plaintiffs allege that defendant "interposed a guiding hand" in Clark Refining's management of the refinery, leaving Clark Refining "no choice but to obey."  See 
Esmark
, 887 F.2d at 756-57 ("A parent corporation, by virtue of its ownership interest, may direct a subsidiary's actions, and the subsidiary will have no choice but to obey.  A parent corporation may disregard the subsidiary's independence at its whim").
  Because plaintiffs' theory of negligence does not rest upon defendant's legal status in relation to Clark Refinery, but instead on defendant's own conduct, we find that plaintiffs have invoked the "direct participation" exception,
 and the duty owed and (allegedly) breached by defendant is that owed by each individual to another " 'to exercise ordinary care to guard against injury which naturally flows as a reasonably probable and foreseeable consequence of his act.'"  
Zakoff v. Chicago Transit Authority
, 336 Ill. App. 3d 415, 421 (2002), quoting 
Nelson v. Union Wire Rope Corp.
, 31 Ill. 2d 69, 86 (1964).
(footnote: 2)  
  
         

Furthermore, viewing all of the evidence in a light most favorable to plaintiffs as nonmovants (as we must do at this stage in the proceedings), there is sufficient evidence that defendant breached its duty to decedents and that this breach was a proximate cause of their deaths.  As stated above, plaintiffs presented evidence that one result of the budget cuts mandated by defendant was a decrease in the number of trained maintenance mechanics at the refinery, undermining the overall level of safety at the refinery.  In fact, the fire was apparently caused by workers who were conducting maintenance on machinery that they were not trained or qualified to work on.  

Defendant maintains that we would be "sweep[ing] aside a well settled framework of corporate law in Illinois" if we were to find that defendant owed a duty to the decedents, and that such a finding would "open up holding companies and other shareholders in Illinois to liability simply because they acted as shareholders."  We disagree.  "Direct participation" liability has long been recognized by courts and commentators alike as a basis for holding corporations responsible for meddling in the affairs of their subsidiaries even where the corporate veil remains impenetrable.  See
 
Bestfoods
, 524 U.S. at 64, 65, 141 L. Ed. 2d at 58, 
118 S. Ct. at 1186; 
Consolidated Rock Products Co.
 312 U.S. at 524, 85 L. Ed. at 992-93, 61 S. Ct. at 684;
 
Pearson
, 247 F.3d at 486-87; 
Esmark
, 887 F.2d at 756
; 
Kingston Dry Dock Co.
 31 F.2d at 267;
 W. Douglas & C. Shanks, 
Insulation From Liability Through Subsidiary Corporations
, 39 Yale L.J. 193, 207 (1929)
; H. Henn & J. Alexander, Laws of Corporations 347 (3d ed. 1983).  This liability, however, is "transaction-specific" and thus limited to those instances where that meddling is directly tied to the resultant harmful or tortious conduct of the subsidiary.  See 
Esmark
, 887 F.2d at 756 (detailing other instances in which parent companies have been held liable for the misconduct of their subsidiaries under the  "direct participation" theory); see also W. Douglas & C. Shanks, 
Insulation From Liability Through Subsidiary Corporations
, 39 Yale L.J. 193, 209 (1929) (emphasis added) ("[T]he use of the latent power incident to stock ownership to accomplish a specific result made the parent a participator in or the doer of the act.  Again, there was interference in the internal management of the subsidiary; an overriding of the discretion of the managers of the subsidiary.  
The connection between the injury and the interference was so intimate as to make the resulting liability direct and not vicarious
"). 
 
  

While they still must convince a jury, plaintiffs have properly alleged a duty owed by defendant and submitted sufficient evidence to survive summary judgment.  Though we offer no comment upon the strength of plaintiffs' evidence, we find that the circuit court erred in finding that defendant owed no duty as a matter of law and that no genuine issues existed as to breach or proximate cause.

  

II.  WORKERS' COMPENSATION IMMUNITY

Defendant also argues that we should affirm the circuit court's grant of summary judgment on the ground that plaintiffs should not be allowed to "circumvent the exclusive remedy provision" of the
 Workers' Compensation Act (820 ILCS 305/1 
et seq
. (West 2002)) (hereinafter the Act).  Apparently defendant contends that, as Clark Refining's sole shareholder, it was also the decedents' employer and, thus, the statutory immunity granted to Clark Refining under the Act should be granted to it as well.  We reject defendant's attempt, however, to have its cake and eat it too: asserting, on the one hand, that it was merely a shareholder in arguing that it owed no duty to the decedents, while, at the same time, attempting to invoke the Act's grant of immunity by characterizing itself as the decedents' employer. 

The seminal treatise, Larson's Workers' Compensation Law, chapter 112 - "Who are 'Third Parties' ": Particular Entities, section 112.01 - Immunity of Affiliated Corporations, provides excellent insight into this issue:

"While one finds in these cases all the usual factors encountered in the many other versions of the problem of disregarding corporate entity, there is a basic difference.  Ordinarily it is the corporation that is trying to insist on its separateness from its subsidiary, and it is the plaintiff that is trying to 'pierce the corporate veil.'  But here the positions are reversed.  The parent strives to disavow its separateness so as to assume identity with its subsidiary and thus share its immunity as employer.  But this makes it vulnerable to the argument that the parent, having deliberately set up the corporate separateness for its own purposes, should not be heard to disavow that separateness when it happens to be to its advantage to do so.  Of course, the more evidence there is of genuine separateness in practice, as of operations, tax liabilities, loans, accounting, insurance, hiring, and payroll, the stronger the case of denying the parent immunity.  

But if the parent corporation faces a dilemma in 

trying to deny the very corporate separateness it 

created, the plaintiff by the same token faces a similar dilemma in reverse.  For purposes of proving his or her 

main case, which usually rests on the theory that the 

parent so completely dominated the subsidiary that it 

should be liable for the subsidiary's torts, the 

plaintiff must ma[k]e the strongest possible case of domination of the subsidiary by the parent.  But the 

more thoroughly the plaintiff succeeds in this demonstration, the more he or she also proves that 

the subsidiary has no real separate identity for legal purposes.

Generally, common ownership, identity of management, and the presence of a common insurer are not enough to create identity between parent and subsidiary for compensation purposes.  Probably the most significant factor is actual control, and if the subsidiary is in practice not only completely owned but completely controlled by the parent, identity may well be found and immunity conferred.  Conversely, a showing of absence of control is perhaps the most effective single way to disprove the unity of parent and subsidiary."  6 A. Larson, Larson's Workers' Compensation Law § 112.01 (2004) 6 A. Larson (hereinafter 
Larson
).

Larson
 discusses several Illinois cases.  In
 Nutt v. Pierce Waste Oil Service, Inc.
, 112 Ill. App. 3d 612 (1983), the plaintiff received worker's compensation from his employer, Industrial Fuels.  He brought a personal injury action against two corporate defendants, Pierce Oil Services, Inc., and Central Refining Co.  All three of the companies were commonly owned.  Industrial Fuels paid the plaintiff's wages and owned the garage where the plaintiff worked for six years (
Larson
 posits that the term of employment was for six months but this is an error.  See 
Nutt v. Pierce Waste Oil Service, Inc.
, 112 Ill. App. 3d at 616).  Both defendants argued that the plaintiff was barred by the exclusive remedy provision of the Workers' Compensation Act (now 820 ILCS 305/5(a)(2002)), and the circuit court granted the defendants summary judgment.  The appellate court held that, although the function of the three companies was centralized, the plaintiff was not a joint employee.  The three companies merely enjoyed a mutual benefit as a result of a multicorporate division of responsibility.  Consequently, the plaintiff was not barred from bringing the personal injury action.  
Nutt v. Pierce Waste Oil Service, Inc.
, 112 Ill. App. 3d at 615-16.

In 
Martin v. McDonald's Corp.
, 213 Ill. App. 3d 487 (1991), an employee of McDonald's was killed in a robbery of the store.  The parents of the deceased employee filed a wrongful death action against McDonald's, alleging it was negligent in enforcing security policies it had undertaken and that its safety procedures had failed.  The defendant asserted that it should enjoy the immunity granted an employer by the Worker's Compensation Act.  The circuit court allowed the case to go to verdict.  The appellate court affirmed the verdict for the plaintiff.  The court reasoned that although the manager was held to be the agent of McDonald's and his negligence was imputed to McDonald's, McDonald's was not an employer for purposes of the Act and did not have immunity.  
Martin v. McDonald's Corp.
, 213 Ill. App. 3d at 496.  But see
 Villa v. Arthur Rubloff & Co. of Illinois
, 183 Ill. App. 3d 746 (1989) (Under the plain language of subsection 5(a), agents of an employer enjoy the same exclusivity defense as the employer (now 820 ILCS 305/5(a) (2002)).   

Finally, 
Larson
 discusses 
Hughey v. Hoffman Rosner Corp.
, 109 Ill. App. 3d 633 (1982), which defendant cites as supporting its assertion that "if Clark Refining *** were [defendant's] agent, [defendant] would be [plaintiffs'] employer and the exclusive remedy provision of the Worker's Compensation Act would bar their claims."  While this proposition 
is
 supported by the holding in 
Villa
 and the plain language of the Act, the holding in 
Hughey
 negatively impacts on defendant's case.  In 
Hughey
, The Hoffman Group asserted that the plaintiff's employer, Western, was a "division" and not a subsidiary of The Hoffman Group.  The circuit court found this assertion to be true and dismissed the plaintiff's complaint against The Hoffman Group as being violative of the exclusivity provision of the Act.  The appellate court affirmed, holding:  

"We recognize the general rule that holding companies and subsidiaries are separate legal entities. [Citation.]  Before this rule can be applied to the case at bar, however, there must be evidence to support the allegation that a parent-subsidiary relationship exists.  Such evidence is absent here."  
Hughey,
 109 Ill. App. 3d at 638.

In 
Gregory v. Garrett Corp
., 578 F. Supp. 871 (S.D. N.Y. 1983), the district court held:

"It is not surprising to find courts concluding that absent exceptional circumstances a parent and subsidiary will be treated as distinct legal entities when sued by the employee or his survivors, even if the parent owns all of the stock of the subsidiary, has the right to control it, and has the same directors as does the subsidiary.  See 
e.g.
 
Stoddard
 [v. 
Ling-Temco-Vought, Inc.
,] 513 F. Supp. [314,] 326 [(C.D. Cal. 1980)]; 
Thomas v. Maigo
, 37 A.D. 2d 754, 323 N.Y.S.2d 106 (1971).  'Implicit in these decisions is the suggestion that the tort system should not deny recovery in an increasingly concentrated economy to an injured employee due to the fortuitous circumstance that the tortfeasor is not a stranger but is controlled by the same business enterprise that controls his immediate employer.' 
Boggs v. Blue Diamond Coal Co.
, 590 F.2d [655,] 662 [(1979)]."  
Gregory v. Garrett Corp.
, 578 F. Supp. at 887.

We also believe that the facts in 
Boggs
 are similar to those alleged in the instant complaint.  There, the parent corporation, Blue Diamond, removed ventilation and safety devices from a coal mine in order to open a new tunnel.  The removals were concealed from the mine inspectors whose job it was to remedy the problem.  As a result of the removals, a buildup of methane gas exploded, killing numerous coal miners employed by Blue Diamond's wholly owned subsidiary, Scotia Coal Company.  The plaintiffs were family members of the deceased miners.  Blue Diamond argued that their claims were barred by the exclusivity provision of Kentucky's worker's compensation statute where the miner's employer, Scotia, paid their claims under that statute.

The Sixth Circuit disagreed, concluding that Blue Diamond and Scotia were "separate and distinct corporations."  
Boggs
, 590 F.2d at 662-63. "These cases are based on the traditional view that a business enterprise has a range of choice in controlling its own corporate structure.  But reciprocal obligations arise as a result of the choice it makes.  The owners may take advantage of the benefits of dividing the business into separate corporate parts, but principles of reciprocity require that courts also recognize the separate identities of the enterprises when sued by an injured employee."  
Boggs
, 590 F.2d at 662.

While defendant's actions in this case were not quite as egregious as those of the Blue Diamond Coal Co., evidence presented by plaintiff strongly indicates that Clark Refining was following the directions of defendant to "decrease capital spending *** to minimum sustainable levels" when Clark Refining severely cut expenditures on maintenance and safety training.  The decedents' deaths were arguably the proximate result of these cuts.  

As noted above, plaintiffs do not suggest that the facts in the instant case are sufficient to find that Clark Refining is the alter ego of defendant.  Consequently, defendant cannot invoke the immunity of the exclusivity provision of subsection 5(a).  However, if defendant did not have an independent duty to decedents, there can be no liability.  See 
Boggs
, 590 F.2d at 663 (stating that 
a parent corporation can only be liable for its own acts of negligence).  
As stated above, plaintiffs presented sufficient evidence to raise an issue of material fact as to whether defendant directly participated in creating conditions within the refinery which led to the deadly fire.  Consequently, we reverse the circuit court order granting defendant summary judgment and remand this matter to the circuit court.  

In doing so, we are cognizant of defendant's argument that plaintiffs do not "offer any logical limit to a sweeping new principle."  Treating a parent corporation as a separate entity from its wholly owned subsidiary and holding it responsible for its own conduct, however, are not "new" principles.  See
 
Bestfoods
, 524 U.S. at 64, 65, 141 L. Ed. 2d at 58, 
118 S. Ct. at 1886 (1998); 
Consolidated Rock Products Co.
 312 U.S. at 524, 85 L. Ed. at 992-93, 61 S. Ct. at 684 (1941);
 
Pearson
, 247 F.3d at 486-87 (2001); 
Esmark
, 887 F.2d at 756; 
Kingston Dry Dock Co
, 31 F.2d at 267 (1929);
 W. Douglas & C. Shanks, 
Insulation From Liability Through Subsidiary Corporations
, 39 Yale L.J. 193, 207 (1929)
; H. Henn & J. Alexander, Laws of Corporations 347 (3d ed. 1983). 
  

We are also cognizant of plaintiffs' argument that if defendant may not be held to be liable under these facts as a matter of law, how are employees to be protected from the actions of a parent corporation in directing its subsidiary to completely cease maintenance and safety training?  

The order of the circuit court granting defendant's motion for summary judgment is reversed and this matter is remanded for further proceedings. 

TULLY, J., concurs.

McNULTY, J., dissents.

JUSTICE McNULTY, dissents. 

The Supreme Court, in 
United States v. Bestfoods
, 524 U.S. 51, 141 L. Ed. 2d 43, 118 S. Ct. 1876  (1998), restated principles concerning a parent corporation's liability for direct participation in allegedly negligent acts affecting a subsidiary.  Although the majority here cites and relies on 
Bestfoods
, the majority does not apply the pertinent principles restated therein.  Proper application of those principles shows that the trial court here correctly granted 
defendant
 
summary judgment
.

In 
Bestfoods
, CPC International owned Ott Chemical Company and installed CPC officials as directors of Ott.  Ott polluted its land for years before its bankruptcy.  The United States sued CPC to recover the costs of cleaning the site.  The district court found CPC liable, both indirectly, as the owner of Ott, and directly, as a direct participant in the facility's pollution.  In finding direct liability, the district court relied on evidence that CPC controlled Ott by placing CPC officers on Ott's board of directors.

On appeal the Supreme Court held:

"It is a general principle of corporate law *** that a parent corporation *** is not liable for the acts of its subsidiaries. 
[Citations.] 
 Thus it is hornbook law that 'the exercise of the "control" which stock ownership gives to the stockholders ... will not create liability beyond the assets of the subsidiary. That "control" includes the election of directors, the making of by-laws ... and the doing of all other acts incident to the legal status of stockholders. Nor will a duplication of some or all of the directors or executive officers be fatal.'"  
Bestfoods
, 524 U.S. at 61-62, 114 L. Ed. 2d at 55-56, 118 S. Ct. at 1884-86, quoting W. Douglas & C. Shanks, 
Insulation From Liability Through Subsidiary Corporations
, 39 Yale L.J. 193, 196 (1929).

Thus, the Supreme Court found CPC's control of Ott's board and the identity of the officers insufficient for the imposition of direct liability.  The Court added:

"[T]he District Court wrongly assumed that the actions of the joint officers and directors are necessarily attributable to CPC. ***

In imposing direct liability on these grounds, the District Court failed to recognize that 'it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts.' 
American Protein Corp. v. AB Volvo
, 844 F.2d 56, 57 ([2d Cir. 1988]), cert. denied, 488 U.S. 852[, 102 L. Ed. 2d 109 , 109 S. Ct. 136] (1988); [citations].

This recognition that the corporate personalities remain distinct has its corollary in the 'well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do "change hats" to represent the two corporations separately, despite their common ownership.' 
Lusk v. Foxmeyer Health Corp.
, 129 F.3d 773, 779 ([5th Cir.] 1997); [citation].  Since courts generally presume 'that the directors are wearing their "subsidiary hats" and not their "parent hats" when acting for the subsidiary,' P. Blumberg, Law of Corporate Groups: Procedural Problems in the Law of Parent and Subsidiary Corporations § 1.02.1, p. 12 (1983); [citations], it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility. The Government would have to show that, despite the general presumption to the contrary, the officers and directors were acting in their capacities as CPC officers and directors, and not as Ott *** officers and directors, when they committed those acts." 
Bestfoods
, 524 U.S. at 68-70, 114 L. Ed. 2d at 60-61, 118 S. Ct. at 1888.

Plaintiff
s here presented evidence that 
defendant
's officers also served as directors of Clark Refining, and the directors of Clark Refining knew of the maintenance problems and approved the budget that slashed funding for training new employees and for maintenance.  But 
plaintiff
s, like the government in 
Bestfoods
, needed to present evidence from which a trier of fact could conclude that those persons acted in their capacities as officers of 
defendant
, and not as officers and directors of Clark Refining, when they committed the allegedly negligent acts. 

Plaintiff
s did not present any evidence that 
defendant
's officers acted solely as such officers, and not also as directors of Clark Refining, when they reduced Clark Refining's budget and left its maintenance department understaffed.  That is, 
plaintiff
s have not presented sufficient evidence to overcome the presumption that the directors wore their "subsidiary hats" and not their "parent hats" when making the decisions that allegedly led to the injuries here.  Melnuk acted, at least in part, as Clark Refining's chief executive officer when he approved minimal funding for maintenance and training.  
Plaintiff
s have shown no evidence of any divergence in interests between 
defendant
 and Clark Refining.  As owners of all stock in Clark Refining, 
defendant
 suffered the entire loss of its subsidiary, and the estates presented no evidence that 
defendant
 profited from Clark Refining's losses.  Most notably, 
plaintiff
s have not alleged any negligent acts committed by persons who served solely as officers of 
defendant
 and not also as officers or directors of Clark Refining.

A trier of fact could infer from 
plaintiff
s' evidence that 
defendant
 set broad policies for its subsidiary, and Clark Refining implemented those policies.  The trier of fact could infer that 
defendant
, through its officers on the board of Clark Refining, controlled Clark Refining.  But, as the court held in 
Bestfoods
, that control gives rise to indirect liability, under the doctrine of piercing the corporate veil, and not to the direct liability the estates ask the court to impose here.  Nothing in the evidence indicates that 
defendant
 abandoned its role as stockholder in its subsidiary, Clark Refining.  
Plaintiff
s have presented no grounds for holding 
defendant
 separately liable for negligence, after its subsidiary has already paid workers' compensation to the estates of the employees killed in the accident at its subsidiary's refinery.

Defendant
's directors and officers acted, in part, as Clark Refining's directors when they adopted a budget that allegedly underfunded Clark Refining's maintenance and training programs.  
Plaintiff
s presented no evidence of separate acts, attributable solely to 
defendant
, by which 
defendant
 and not Clark Refining caused the injuries here.  Because 
plaintiff
s have not presented grounds for holding 
defendant
 directly liable for the accident at Clark Refining's refinery, I would affirm the decision to grant summary judgment in favor of 
defendant
.  Accordingly, I dissent.

FOOTNOTES
1: 
Plaintiffs also named as defendants Universal Oil Products, the designer and builder of the equipment that was involved in the fire, and JBF Associates, a consulting firm that had performed work at the refinery.  Universal Oil Products settled with plaintiffs and JBF Associates was granted summary judgment by the circuit court.  Neither Universal Oil Products nor JBF Associates is a party to this appeal.

2:
The dissent states that "[a]s owners of all stock in Clark Refining, defendant suffered the entire loss of its subsidiary, and the estates presented no evidence that defendant profited from Clark Refining's losses."  Slip op. at 29.  The question of whether a duty is owed, however, does not depend upon the presence or absence of pecuniary gain by the would-be defendant, or upon the defendant's motive in committing the allegedly negligent acts.  Instead, it turns on the reasonable foreseeability of injury, the likelihood of injury, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden upon the defendant.  See 
Sollami
, 201 Ill. 2d at 17 (2002); 
Jones
, 191 Ill. 2d at 303.  Whether defendant benefitted in any way from its conduct in creating the economically efficient but allegedly dangerous conditions at the refinery, why it chose to mandate the budget cuts, or the fact that, as the refinery's sole shareholder, defendant "suffered the entire loss" is irrelevant.  The "duty" question revolves around whether defendant directly participated in creating the allegedly unsafe conditions
 in which the fire occurred.  We find that plaintiffs have submitted enough evidence to permit a rational trier of fact to answer that question in the affirmative.