Docket No. 101570.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

MARGUERITE FORSYTHE *et al.*, Appellees, v. CLARK USA, INC., Appellant.

*Opinion filed February 16, 2007.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Justices Fitzgerald and Karmeier concurred in the judgment and opinion.

Justice Freeman specially concurred, with opinion, joined by Justice Burke.

Chief Justice Thomas and Justice Kilbride took no part in the decision.

## OPINION

On March 13, 1995, Michael F. Forsythe and Gary Szabla, mechanics at a refinery owned and operated by Clark Refining and Marketing (Clark Refining), were killed. The estate of each decedent received payment from Clark Refining pursuant to the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2002)). In 1996 and 1997, plaintiffs Marguerite Forsythe and Elizabeth Szabla, as special administrators of the estates of their late husbands, filed suits against Clark Refining and other defendants. Subsequently, plaintiffs

added Clark Refining's parent company, Clark USA, as a defendant.

Clark USA is the only defendant involved in this appeal. At the close of discovery, the trial court granted Clark USA's motion for summary judgment pursuant to section 2–1005 of the Code of Civil Procedure (735 ILCS 5/2–1005 (West 2002)). The trial court did not state its reasoning. Plaintiffs appealed, and the appellate court reversed and remanded. 361 Ill. App. 3d 642. Following that decision, defendant petitioned this court for leave to appeal pursuant to Supreme Court Rule 315 (177 Ill. 2d R. 315).

We granted defendant's petition to consider two issues: first, whether a parent company can be held liable under a theory of direct participant liability for controlling its subsidiary's budget in a way that led to a workplace accident; second, if such a theory is recognized, whether the exclusive-remedy provision of the Workers' Compensation Act (820 ILCS 305/5 (West 2002)) immunizes a parent company from liability.

BACKGROUND

Clark Refining operated an oil refinery in Blue Island, Illinois. Defendant is Clark Refining's parent company and sole shareholder. On March 13, 1995, decedents were on their lunch break when a fire broke out at the refinery, killing them both. The fire was apparently caused when other Clark Refining employees attempted to replace a valve on a pipe without ensuring that flammable materials within the pipe had been depressurized. Plaintiffs claim that those employees were not maintenance mechanics and were not trained or qualified to perform the work they were attempting.

Plaintiffs' allegations of liability center around defendant's overall budgetary strategy. Specifically, plaintiffs allege that defendant breached a duty to use reasonable care in imposing its business strategy on Clark Refining by (1) "requiring [Clark Refining] to minimize operating costs including costs for training, maintenance, supervision and safety," (2) "requiring [Clark Refining] to limit capital investments to those which would generate cash for the refinery thereby preventing [Clark Refining] from adequately reinforcing the walls of the lunchroom or relocating the lunchroom to a safe position within the refinery," and (3) "failing to adequately

evaluate the safety and training procedures in place at the Blue Island Refinery." Moreover, plaintiffs allege that defendant's strategy of capital cutbacks forced Clark Refining to have unqualified employees act as maintenance mechanics which, in turn, led to the fire that killed the decedents. This, plaintiffs argue, constitutes proximate cause.

In support of its motion for summary judgment, defendant contended that it owed no duty to either decedent by virtue of its status as a mere holding company, which was connected to Clark Refining only as a shareholder. Defendant submitted evidence to prove that Clark Refining owned and operated the refinery while defendant itself had no control over the day-to-day operations. Plaintiffs countered that defendant was directly responsible for creating conditions that precipitated the accident.

In support of their argument, plaintiffs cited evidence that defendant's directors created and approved Clark Refining's budget, striving to "position itself as a low cost refiner and marketer" with the goal of replenishing defendant's cash reserve by "decreas[ing] capital spending *** to minimum sustainable levels" through the institution of a "survival mode" business plan. Plaintiffs also produced evidence that the boards of directors of Clark Refining and defendant met simultaneously. Moreover, plaintiffs relied upon evidence that the belt-tightening budget created by Clark Refining was overseen by Paul Melnuk, who served as defendant's president as well as chief executive officer of Clark Refining.

The trial court granted summary judgment without explanation. Subsequently, plaintiffs appealed and the appellate court reversed and remanded, rejecting a claim by defendant that it was entitled to immunity under the Workers' Compensation Act. The appellate court held that "plaintiffs presented sufficient evidence to raise an issue of material fact as to whether defendant directly participated in creating conditions within the refinery which led to the deadly fire." 361 Ill. App. 3d at 655. One justice dissented, finding that plaintiffs presented no evidence of separate acts, attributable solely to defendant, by which defendant directly caused the injuries in this case. 361 Ill. App. 3d at 658 (McNulty, J., dissenting).

ANALYSIS

Section 2–1005 of the Code of Civil Procedure provides for summary judgment when the pleadings, depositions, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2–1005 (West 2002). The purpose of summary judgment is not to try a question of fact but simply to determine if one exists. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002). In reviewing a summary judgment disposition, this court will construe the record strictly against the movant and liberally in favor of the nonmoving party. *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 423-24 (1998). Moreover, it must be noted that summary judgment dispositions "should not be allowed unless the moving party's right to judgment is clear and free from doubt." *Jackson*, 185 Ill. 2d at 424. If the undisputed material facts could lead reasonable observers to divergent inferences, or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact. *Jackson*, 185 Ill. 2d at 424. This court reviews a grant of summary judgment *de novo*. *Roth v. Opiela*, 211 Ill. 2d 536, 542 (2004).

I. Direct Participant Liability

To state a cause of action for negligence, plaintiffs must show that defendant owed and breached a duty of care, proximately causing the plaintiffs injury. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 114 (1995). The threshold issue in this case is the existence of a duty, which is a question of law for the court to decide. *Chandler v. Illinois Central R.R. Co.*, 207 Ill. 2d 331, 340 (2003). As we have recently stated, the "touchstone of this court's duty analysis is to ask whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 436 (2006), citing *Happel v. Wal-Mart Stores, Inc.*, 199 Ill. 2d 179, 186 (2002). Four factors inform this inquiry: (1) the reasonable foreseeability of injury, (2) the likelihood of injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing the burden upon the defendant. *Marshall*, 222 Ill. 2d at 436-37.

-4-

Before undertaking our analysis, we note, as did the parties and the appellate court, that the theory of direct participant liability presented here has not previously been addressed in Illinois. It has been addressed in other states and throughout the federal courts, however. We will consider this authority where appropriate in our analysis.

Plaintiffs argue that defendant demanded Clark Refining operate its refinery pursuant to an overall business strategy that it knew would adversely affect safety by forcing reductions in training and maintenance. Indeed, plaintiffs contend that defendant actively and directly mandated unreasonable cuts in Clark Refining's budget in order to carry out its strategy. This strategy was outlined in Clark USA business records calling for a "survival mode" business philosophy accomplished through "reduced capital spending," "reduced working capital investment," and "reduced operating expense level." Plaintiffs allege that this "survival mode" strategy was mandated, despite the fact that defendant knew or should have known that the only feasible budget cuts would come from safety, maintenance, and training expenses. This, plaintiffs' conclude, constitutes direct participation by defendant in the harm caused. As such, plaintiffs contend the appellate court correctly found that defendant owed them a duty based on the direct participant theory and not on the legal relationship of defendant to its subsidiary.

Defendant contends that unless the standards for piercing the corporate veil are met, a parent company cannot be held liable for the negligence of its subsidiary. Attendant to that rule is the principle that a parent company does not owe a duty to third parties to supervise or control the conduct of its subsidiary to ensure that the subsidiary acts with reasonable care. Clark Refining owed a nondelegable duty to its employees to provide them with a safe workplace while defendant, as a parent, owed no duty whatsoever to ensure that Clark Refining met its obligations.

Additionally, even if direct liability is a recognized theory of recovery, defendant argues that the simple task of setting financial goals and employing an overall strategy to meet those goals is not improper but, instead, is "consistent with the parent's investor status" and thus "should not give rise to direct liability." *United States v. Bestfoods*, 524 U.S. 51, 69, 141 L. Ed. 2d 43, 62, 118 S. Ct. 1876,

1889 (1998). Because its conduct was always consistent with its investor status, defendant claims, there is no basis to treat it as a direct participant in the negligence alleged herein.

While the Supreme Court has held that "[i]t is a general principle *** deeply 'ingrained in our economic and legal systems' that a parent corporation *** is not liable for the acts of its subsidiaries" (*Bestfoods*, 524 U.S. at 61, 141 L. Ed. 2d at 55-56, 118 S. Ct. at 1884, quoting W.O. Douglas & C. Shanks, *Insulation from Liability Through Subsidiary Corporations*, 39 Yale L.J. 193 (1929)), a significant body of case law supports the direct participant theory of liability urged by the plaintiffs. Some of that authority relies on the 1929 article quoted above and written, in relevant part, by then-Professor William O. Douglas.

Douglas noted that liability has been imposed in "instances where the parent is directly a participant in the wrong complained of." 39 Yale L.J. at 208. In such instances, "the use of the latent power incident to stock ownership to accomplish a specific result made the parent a participator in or doer of the act," specifically evident where "there was interference in the internal management of the subsidiary; an overriding of the discretion of the managers of the subsidiary." 39 Yale L.J. at 209. Douglas stated further that "direct intervention or intermeddling by the parent in the affairs of the subsidiary and more particularly in the transaction involved, to the disregard of the normal and orderly procedure of corporate control carried out through the election of the desired directors and officers of the subsidiary and the handling by them of the direction of its affairs, seems to have been determinative in some cases to holding the parent liable." 39 Yale L.J. at 218.

The United States Supreme Court quoted the Douglas & Shanks article approvingly in *Bestfoods*, 524 U.S. at 64-65, 141 L. Ed. 2d at 58, 118 S. Ct. at 1886 ("As Justice (then-Professor) Douglas noted almost 70 years ago, derivative liability cases are to be distinguished from those in which 'the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management' and 'the parent is directly a participant in the wrong complained of.' [Citation.] In such instances, the parent is directly liable for its own actions"). The Court noted that the simple fact that directors of a parent corporation serve as directors of its subsidiary does not,

standing alone, expose the parent corporation to liability for its subsidiary's acts. *Bestfoods*, 524 U.S. at 69-70, 141 L. Ed. 2d at 60-61, 118 S. Ct. at 1888. The Court went on to state, however, that "the acts of direct operation that give rise to parental liability must necessarily be distinguished from the interference that stems from the normal relationship between parent and subsidiary," and "[t]he critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility." *Bestfoods*, 524 U.S. at 71-72, 141 L. Ed. 2d at 62, 118 S. Ct. at 1889.

Similarly, in *Esmark, Inc. v. National Labor Relations Board*, 887 F.2d 739 (7th Cir. 1989), the Seventh Circuit, in a case dealing with a potential violation of the National Labor Relations Act, cited Douglas & Shanks' article extensively and noted that Judge Learned Hand also recognized that a parent corporation could be held liable for the actions of its subsidiaries if the parent directly supervised the conduct of a specific transaction. In *Kingston Dry Dock Co. v. Lake Champlain Transportation Co.*, 31 F.2d 265, 267 (2d Cir. 1929), Judge Hand wrote that such liability "normally must depend upon the parent's direct intervention in the transaction, ignoring the subsidiary's paraphernalia of incorporation, directors and officers." Relying on that authority, the Seventh Circuit held that "a parent corporation may be held liable for the wrongdoing of a subsidiary where the parent directly participated in the subsidiary's unlawful actions." *Esmark*, 887 F.2d at 756.

Moreover, the court held that "[w]here the parent specifically directs the actions of its subsidiary, using its ownership interest to command rather than merely cajole" the possibility of direct liability is present and will be imposed "where a parent disregards the separate legal personality of its subsidiary (and the subsidiary's own decisionmaking 'paraphernalia'), and exercises direct control over a specific transaction." *Esmark*, 887 F.2d at 757. The court described this as a "transaction-specific" theory of direct participation, citing numerous cases where parent companies have been held liable for misconduct by their subsidiaries. *Esmark*, 887 F.2d at 756 (collecting cases); see, *e.g.*, *L.B. Industries, Inc. v. Smith*, 817 F.2d 69, 71 (9th Cir. 1987) (*per curiam*)*; United States v. Sutton,* 795 F.2d 1040, 1060 (Temp. Emer. Ct. App. 1986) ("A shareholder may be liable if he is

a 'central figure' in a corporation's tortious conduct"); *Cher v. Forum International, Ltd.*, 692 F.2d 634, 640 (9th Cir. 1982); *D.L. Auld Co. v. Park Electrochemical Corp.*, 553 F. Supp. 804, 808 (E.D.N.Y. 1982) (denying summary judgment in favor of the defendant where the plaintiff presented a claim that the defendant participated in the patent infringement perpetrated by its subsidiary); *International Union, United Auto Workers v. Cardwell Manufacturing Co.*, 416 F. Supp. 1267, 1283-84, 1287-89 (D. Kan. 1976) (court found a parent liable for breach of bargaining agreement by subsidiary where parent specifically directed the subsidiary to disregard obligations under the NLRA); *State v. Ole Olsen, Ltd.*, 35 N.Y.2d 979, 980, 365 N.Y.S.2d 528, 528-29, 324 N.E.2d 886, 886 (1975) (holding a corporate officer liable not on account of his being an officer of the corporate defendant but as an active individual participant in the wrongdoing); *Cooper v. Cordova Sand & Gravel Co.*, 485 S.W.2d 261, 271-72 (Tenn. App. 1971); *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 619, 233 N.E.2d 748, 752 (1968) (holding that while common ownership and management will not ordinarily give rise to liability, liability may be imposed where there is active and direct participation by one corporation in the affairs of another or where there is "confused intermingling" of the activities of the two corporations); *Crescent Manufacturing Co. v. Hansen*, 174 Wash. 193, 198, 24 P.2d 604, 606 (1933). Under this "transaction-specific" theory, shareholders or parent corporations are not held directly liable for their own independently wrongful acts but, instead, for their actions against third-party interests through the agency of subsidiaries. *Esmark*, 887 F.2d at 756. Accordingly, the court held that a parent corporation can be liable for interposing a guiding hand in the transactions of its subsidiary. *Esmark*, 887 F.2d at 756.

Plaintiffs also cite other cases approving of direct liability. In *Papa v. Katy Industries, Inc.*, 166 F.3d 937, 941 (7th Cir. 1999), the Seventh Circuit, again interpreting the National Labor Relations Act, evinced its continuing support for direct participant liability when it cited *Esmark*, *Bestfoods*, and *Kingston Dry Dock* to state "that limited liability does not protect a parent corporation when the parent is sought to be held liable for its own act, rather than merely as the owner of the subsidiary that acted." Similarly, in *Pearson v. Component Technology Corp.*, the Third Circuit, interpreting federal

-8-

law, stated that "[a]lthough not often employed *** it has long been acknowledged that parents may be 'directly' liable for their subsidiaries' actions when the 'alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management,' and the parent has interfered with the subsidiary's operations in a way that surpasses the control exercised by a parent as an incident of ownership." *Pearson*, 247 F.3d 471, 486-87 (3d Cir. 2001), citing *Bestfoods*, 524 U.S. at 64, 141 L. Ed. 2d at 58, 118 S. Ct. at 1886, quoting 39 Yale L.J. at 207. Likewise, in *Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655, 663 (6th Cir. 1979), the Sixth Circuit, interpreting Kentucky law, implicitly indicated its recognition of direct liability when it stated that "a parent is not immune from tort liability to its subsidiary employees for its own, independent acts of negligence."

The Indiana Supreme Court, in *Commissioner of Department of Environmental Management v. RLG, Inc.*, 755 N.E.2d 556, 559, 563 (Ind. 2001), also accepted direct participant liability when it held a defendant's sole officer and shareholder liable for violations of Indiana environmental laws and stated that "an individual, though acting in a corporate capacity *** may be individually liable *** as a direct participant under general legal principles." Additionally, the Iowa Supreme Court accepted a direct participant theory of liability when it held that a member of a limited liability corporation could be sued because it had undertaken to perform management services for the corporation and allegedly performed those services negligently. *Estate of Countryman v. Farmers Cooperative Ass'n*, 679 N.W.2d 598, 605 (Iowa 2004). Other courts have also accepted the theory of direct participant liability. See, *e.g.*, *United States v. TIC Investment Corp.*, 68 F.3d 1082, 1091 n.9 (8th Cir. 1995) (interpreting the Comprehensive Environmental Response, Compensation, and Liability Act, the court held that "a parent corporation may be directly liable for activities carried out ostensibly by its subsidiary if the parent corporation, in effect, actually operated the subsidiary's facility by having the authority to control and actually or substantially controlling the facility"); *United States v. Kayser-Roth Corp.*, 910 F.2d 24, 27 (1st Cir. 1990) (parent corporation can be held directly liable if actively involved in the affairs of its subsidiary); *Dassault Falcon Jet Corp. v. Oberflex, Inc.*, 909 F. Supp. 345, 347, 354

(M.D.N.C. 1995) (direct participant liability could be maintained against a parent company for breach of warranty). Taken together, these cases make evident the substantial weight of authority supporting recognition of this theory of liability.

In opposition to plaintiffs' theory, defendant contends that a parent corporation owes no duty to supervise its subsidiary's conduct for the benefit of third parties. Defendant cites *Young v. Bryco Arms*, 213 Ill. 2d 433, 452 (2004), where this court noted its recognition of the general rule that "one has no duty to control the conduct of another to prevent him from causing harm to a third party, absent a special relationship with either the person causing the harm or the injured party." Building on that point, defendant argues that courts have uniformly rejected the argument that the parent-subsidiary relationship qualifies as the kind of "special relationship" necessary to give rise to a duty to supervise or control the conduct of the subsidiary. *In re Birmingham Asbestos Litigation*, 619 So. 2d 1360 (Ala. 1993). Supporting this contention, defendant cites *Joiner v. Ryder System Inc.*, 966 F. Supp. 1478 (C.D. Ill. 1996), where the district court applied Illinois law and concluded that a duty could not be predicated either on the parent's ability to control its subsidiary or on its actual exercise of control:

> "RSI–as every parent corporation does–obviously has the power to control its subsidiaries. In fact, RSI owns them and RSI can 'force' them to do anything it wants. That power, by itself, however, does not impose a duty upon RSI. Only if RSI abused the power–by exerting too much control–could it be held liable for the conduct of its subsidiaries as an alter ego." *Joiner*, 966 F. Supp. at 1490.

Additionally, defendant contends that direct participant claims virtually identical to those raised here were rejected by two state appellate decisions, one from Texas and one from California. In *Coastal Corp. v. Torres*, 133 S.W.3d 776 (Tex. App. 2004), refinery employees injured in an explosion brought a negligence action against the refinery's parent company. The employees alleged that " 'through central budgetary authority exercised by Coastal's corporate officers *** Coastal *** assumed control over maintenance, turnaround, and inspection matters at the plant,' " limited expenditures, and "controlled and influenced its subsidiary in a way that directly

-10-

resulted in appellees' injuries." *Coastal Corp.*, 133 S.W.3d at 777, 779. The *Coastal Corp.* court noted that the plaintiffs in that case alleged "negligent control of the budget, not negligent control over details of specific operational activities," and eventually found that the parent company had no duty as a matter of Texas law to "approve budgets for its subsidiaries in order to assure that the subsidiaries repair defects on their premises." *Coastal Corp.*, 133 S.W.3d at 779, 782.

Similarly, in *Waste Management Inc. v. Superior Court of San Diego*, 69 Cal. Comp. Cas. 759 (2004), plaintiffs brought an action against a parent company for negligently controlling its subsidiary's budget such that the subsidiary was prevented from replacing and repairing trash trucks. The court recognized direct participant liability and stated that "the parent may owe a duty arising out of obligations independent of the parent subsidiary relationship." *Waste Management.*, 69 Cal. Comp. Cas. at 762. The court went on to hold, however, that "[n]egligently controlling or intentionally mismanaging a subsidiary's budget does not create a duty on the part of the parent corporation to ensure safety or prevent injuries to the subsidiary's employees." *Waste Management*, 69 Cal. Comp. Cas. at 763.

As defendant points out, *Coastal Corp.* and *Waste Management* stand for the proposition that mere budgetary mismanagement is not enough to support direct participant liability. Additionally, however, the *Coastal Corp.* court noted that "it is apparent that liability is imposed when there is specific control over the activity that caused the accident." *Coastal Corp.*, 133 S.W.3d at 779. Similarly, the *Waste Management* court stated that the plaintiffs' case failed because they could not show that the parent company "directed and authorized the *manner* in which the subsidiary conducted its business." (Emphasis in original). *Waste Management*, 69 Cal. Comp. Cas. at 763. In other words, these courts found that a viable claim of liability under the direct participant theory cannot rest solely upon budgetary mismanagement, but budgetary mismanagement can make up one part of a viable claim, in conjunction with the direction or authorization of the manner in which an activity is undertaken. The *Joiner* decision echoes this sentiment. There, the court granted summary judgment in favor of the parent/defendant, noting significantly that the parent/defendant did "not get involved in the

-11-

day-to-day activities or management of the subsidiaries." *Joiner*, 966 F. Supp. at 1490. Based upon this analysis, we conclude that budgetary mismanagement, accompanied by the parent's negligent direction or authorization of the manner in which the subsidiary accomplishes that budget, can lead to a valid cause of action under the direct participant theory of liability.

Considering the above, we hold that direct participant liability is a valid theory of recovery under Illinois law. Where there is evidence sufficient to prove that a parent company mandated an overall business and budgetary strategy *and* carried that strategy out by its own specific direction or authorization, surpassing the control exercised as a normal incident of ownership in disregard for the interests of the subsidiary, that parent company could face liability. The key elements to the application of direct participant liability, then, are a parent's specific direction or authorization of the manner in which an activity is undertaken and foreseeability. If a parent company specifically directs an activity, where injury is foreseeable, that parent could be held liable. Similarly, if a parent company mandates an overall course of action and then authorizes the manner in which specific activities contributing to that course of action are undertaken, it can be liable for foreseeable injuries. We again stress, though, that allegations of mere budgetary mismanagement alone do not give rise to the application of direct participant liability.

Our finding is supported by the policy-based factors courts use to determine whether a duty exists. *Marshall v. Burger King Corp.*, 222 Ill. 2d at 436-37 (the factors are (1) the reasonable foreseeability of injury, (2) the likelihood of injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing the burden upon the defendant). Certain heavy industries, like refining, inherently involve a great amount of danger. It is conceivable that severe cutbacks in staffing, safety, maintenance, and training in such industries could lead, with reasonable foreseeability, to the injury of others. The likelihood of injury in those circumstances would not be remote and could be deadly. Additionally, the magnitude of the burden of guarding against such injury would not be great. Parent companies are free to craft overall business and budgetary strategies; such companies simply must not interfere directly in the manner their subsidiaries undertake certain activities such that the subsidiaries are

-12-

no longer free to utilize their own expertise. Alternatively, if parent companies do interfere directly in the manner their subsidiaries undertake certain activities, they must do so with reasonable care. Finally, it is not an undue burden to require that parent corporations engage in the considered exercise of due care in an already limited role. As we have already acknowledged, parent corporations are generally not liable for the acts of their subsidiaries. *Bestfoods*, 524 U.S. at 61, 141 L. Ed. 2d at 55-56, 118 S. Ct. at 1884, quoting 39 Yale L.J. 193 (1929). Moreover, the mere fact of a parent-subsidiary relationship, without a great deal more, does not give rise to liability. *Bestfoods*, 524 U.S. at 61, 141 L. Ed. 2d at 56, 118 S. Ct. at 1884, quoting 1 W. Fletcher, Cyclopedia of Law of Private Corporations §33, at 568 (rev. ed. 1990).

This court has repeatedly and consistently highlighted the point that it is "axiomatic that every person owes to all others a duty to exercise ordinary care to guard against injury which naturally flows as a reasonably probable and foreseeable consequence of his act." *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 32 (1992), quoting *Nelson v. Union Wire Rope Corp.*, 31 Ill. 2d 69, 86 (1964); see also *Mt. Zion State Bank & Trust v. Consolidated Communications, Inc.*, 169 Ill. 2d 110, 124 (1995); *Widlowski v. Durkee*, 138 Ill. 2d 369, 373 (1990); *Feldscher v. E & B, Inc.*, 95 Ill. 2d 360, 368-69 (1983). Recognizing that a parent company may have a duty based upon direct participant liability does not end the analysis though. Certain facts must still be present to give rise to its application.

## II. Direct Participant Liability Applied

Returning to the specific issue in this case, we must resolve whether there exists a question of material fact such that the evidence presented could lead a reasonable observer to believe that defendant's overall business and budgetary strategy involved the negligent direction or authorization of the manner in which Clark Refining conducted its business. If so, the trial court's grant of summary judgment was inappropriate.

Defendant's overall business strategy at the time of the tragic accident involved here mandated increased productivity driven, at least in part, by budgetary cuts. The question remains, though,

whether those cuts were negligently directed by or conducted in a manner authorized by defendant at the expense of Clark Refining. Answering this question requires a close look at the role of defendant's president, Paul Melnuk, who also served as chief executive officer of Clark Refining.

In *Bestfoods*, the Supreme Court pointed out that lower courts must "recognize that 'it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts.' " *Bestfoods*, 524 U.S. at 69, 141 L. Ed. 2d at 60, 118 S. Ct. at 1888, citing *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 57 (2d Cir. 1988). The Court acknowledged the " 'well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do "change hats" to represent the two corporations separately, despite their common ownership.' " *Bestfoods*, 524 U.S. at 69, 141 L. Ed. 2d at 61, 118 S. Ct. at 1888, citing *Lusk v. Foxmeyer Health Corp*, 129 F.3d 773, 779 (5th Cir. 1997). Further, the Court noted that it should be presumed that directors are wearing their "subsidiary hats," rather than their "parent hats," when acting for the subsidiary. *Bestfoods*, 524 U.S. at 69, 141 L. Ed. 2d at 61, 118 S. Ct. at 1888.

Accordingly, to establish liability, plaintiffs must establish more than the fact that Paul Melnuk made policy decisions and supervised subsidiary activities. *Bestfoods*, 524 U.S. at 69, 141 L. Ed. 2d at 61, 118 S. Ct. at 1888. Instead, plaintiffs must show that the conduct complained of occurred while Paul Melnuk was acting in his capacity as an officer of Clark USA, rather than as an officer of Clark Refining. *Bestfoods*, 524 U.S. at 69, 141 L. Ed. 2d at 61, 118 S. Ct. at 1888. In attempting to do so, plaintiffs point to additional language from *Bestfoods*, where the Court stated that "the presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent." *Bestfoods*, 524 U.S. at 70 n.13, 141 L. Ed. 2d at 61 n.13, 118 S. Ct. at 1888 n.13.

Seizing upon that language, plaintiffs point to the April 1995

"Memorandum to the Executive Committee," prepared by Paul Melnuk, completed on Clark USA letterhead, and including a document entitled "1995 Economic Imperatives." Moreover, plaintiffs point to another Clark USA business record, the agenda for the February 15, 1995, board of directors meeting, which includes a section entitled "Clark USA Liquidity Overview." That document lays out a "survival mode" business philosophy marked by "reduced capital spending," "reduced working capital investment," and "reduced operating expense level." The document further states that the "goal is to replenish [defendant's] strategic cash reserve to $200 million." Defendant's continued emphasis on this goal is supported by the "1995 Economic Imperatives," one of which was to "[r]eplenish cash balance to 200 million" by reducing capital spending to "minimum sustainable levels." Relying on this, plaintiffs contend that the business and budgetary strategy defendant mandated in this case was carried out for its own benefit at the foreseeable expense of safety and spending at Clark Refining and at the direction of Paul Melnuk. As such, the only benefit of the business and budgetary strategy involved in this case ran to defendant and not Clark Refining. This, plaintiffs argue, proves that Paul Melnuk was acting not on behalf of Clark Refining but, instead, on behalf of Clark USA.

In opposition, defendant cites the testimony of Paul Melnuk himself where he claims that the 1995 Imperatives, though completed on defendant's letterhead, were actually carried out for Clark Refining. Additionally, defendant notes that the 1995 Imperatives include discussion of the continuing need to spend on necessary health and safety as well as ensure that all existing environmental, health, and safety needs are fully supported.

At the very least, there is a genuine issue of material fact as to whose "hat" Melnuk was wearing when he completed the 1995 memorandum. If the fact-finder concludes that Melnuk was acting on behalf of defendant and thus wearing his Clark USA "hat," there is some evidence that he was directing or authorizing the manner in which Clark Refining's budget was implemented such that he had a duty, under the direct participant theory of liability, to do so with reasonable care. The additional evidence produced by plaintiffs indicating that Melnuk knew both that the budgetary reductions

involved here had to come in large part from controllable costs such as education, training, repairs, and equipment maintenance, and that these reductions were compromising safety at the refinery raises an issue of material fact as to whether or not defendant breached that duty. The trial court's grant of summary judgment was therefore inappropriate.

If Paul Melnuk, acting on behalf of defendant, directed or authorized the manner in which the budget cuts in this case were taken, he had a duty to do so in a nonnegligent way. If Melnuk directed or authorized the manner in which the budget cuts at issues were taken, knowing that safety at the Blue Island refinery would be compromised, and did so superseding the discretion and interest of Clark Refining, direct participant liability could attach. Determining whether this duty applies to the facts of this case, and whether defendant is liable, involves factual inquiry. See, *e.g.*, *O'Hara v. Holy Cross Hospital*, 137 Ill. 2d 332, 342-44 (1990) (this court held that whether or not a hospital had a duty to protect a nonpatient invited into an emergency room involved a factual inquiry into whether the nonpatient was invited to participate in the care and treatment of the patient and thus summary judgment in favor of hospital was inappropriate). This inquiry is not suitable for this court on review and not appropriate for disposition at summary judgment, especially considering that this court must interpret the record strictly against the moving party and liberally in favor of the nonmoving party. *Jackson*, 185 Ill. 2d at 423-24.

III. Immunity Under the Illinois Workers' Compensation Act

Having found that direct participant liability is a potentially valid theory of recovery in this case, and that a genuine issue of material fact exists as to its application, we still must analyze the exclusive remedy provision of the Workers' Compensation Act (820 ILCS 305/5(a) (West 2002)). Defendant claims that, even if it were found liable under the direct participant theory, the exclusivity provision renders it immune. The provision, found in section 5(a) of the Act, provides:

> "No common law or statutory right to recover damages from the employer *** for injury or death sustained by any

employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act ***." 820 ILCS 305/5(a) (West 2002).

This provision serves a balancing function. On the one hand, the Act establishes a new "system of liability without fault, designed to distribute the cost of industrial injuries without regard to common-law doctrines of negligence, contributory negligence, assumption of risk, and the like." *Gannon v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 13 Ill. 2d 460, 463 (1958). On the other hand, the Act imposes "statutory limitations upon the amount of the employee's recovery, depending upon the character and the extent of the injury" and provides "that the statutory remedies under it shall serve as the employee's exclusive remedy if he sustains a compensable injury." *McCormick v. Caterpillar Tractor Co.*, 85 Ill. 2d 352, 356 (1981).

Defendant asserts that plaintiffs' theory of liability in this case should be treated no differently than a conventional veil-piercing theory, contending that plaintiffs' claim has to be that the parent company interfered to such an extent in the subsidiary's business that it should be treated as if it were the subsidiary. In that situation, defendant continues, the parent company has become the subsidiary/employer and should be subject to the same burdens and entitled to the same protections a subsidiary/employer would have under the Workers' Compensation Act. See *Kotecki v. Cyclops Welding Corp.*, 146 Ill. 2d 155 (1991) (holding that a third party sued by an employee injured in a workplace accident can bring a contribution claim against the employer, but that the employer's liability is limited to the amount it would be required to pay under the Workers' Compensation Act).

We reject this argument. Direct participant liability, as we now recognize it, does not rest on piercing the corporate veil such that the liability of the subsidiary is the liability of the parent. On the contrary, this form of liability is asserted, as its name suggests, for a parent's direct participation, superseding the discretion and interest of the subsidiary, and creating conditions leading to the activity complained of. Here, plaintiffs claim that defendant directly participated in creating conditions within the Blue Island refinery that led to the fire by directing or authorizing the manner in which Clark Refining's

-17-

cost-cutting budget was instituted with no regard for the discretion and interest of Clark Refining itself.

In essence, defendant is requesting that it be allowed to pierce its own corporate veil in order to avoid liability. Illinois courts have consistently expressed reluctance for allowing such a practice. See *In re Rehabilitation of Centaur Insurance Co.*, 158 Ill. 2d 166, 173-74 (1994) (citing with approval the principle that the general law mandates that piercing must never be made in favor of a corporation or its shareholders); *Main Bank of Chicago v. Baker*, 86 Ill. 2d 188, 206 (1981) (stating that a party "cannot assert the equitable doctrine of piercing the corporate veil to disregard the separate corporate existence of a corporation he himself created to gain an advantage which would be lost under his present contention"); see *Hughey v. Hoffman Rosner Corp.*, 109 Ill. App. 3d 633, 636 (1982); *Schmidt v. Milburn Brothers, Inc.*, 296 Ill. App. 3d 260, 267 (1998). The appellate court in this case recognized this point when it rejected defendant's attempt "to have its cake and eat it too: asserting, on the one hand, that it was merely a shareholder in arguing that it owed no duty to the decedents, while, at the same time, attempting to invoke the Act's grant of immunity by characterizing itself as the decedents' employer." 361 Ill. App. 3d at 651-52.

In *Schmidt*, this point was made particularly clear. That case involved a plaintiff injured in a collision with a driver who worked for a company loosely affiliated with the defendant, plaintiff's own employer. The defendant in the case asserted the protection of the exclusive remedy provision of the Workers' Compensation Act. The court was not persuaded, stating that:

> "[I]f defendants are right, [defendant] pays nothing for the negligence of its driver– no workers' compensation premiums, no workers' compensation benefits, no tort liability. That would turn the exclusive remedy provision of the [Workers' Compensation Act] into a sword, instead of a shield. No useful societal purpose would be served. [Defendant] would receive all the benefits the law provides to a separate and distinct corporate body with none of the usual detriments ***." *Schmidt*, 296 Ill. App. 3d at 269.

We agree with this analysis. It was Clark Refining, not defendant, who paid workers' compensation benefits to the decedents' families.

-18-

It was Clark Refining, not defendant, who actually employed the decedents. As such it is Clark Refining, not Clark USA, that should enjoy the exclusive remedy provision of the Workers' Compensation Act. We decline to allow Clark USA to pierce its own corporate veil. Accordingly, the Workers' Compensation Act does not immunize defendant from liability.

## CONCLUSION

Drawing no ultimate conclusions on the merits of plaintiffs' case and mindful that summary judgment is an extraordinary remedy, summary judgment was inappropriate in this matter. We recognize the direct participant theory of liability. We note, however, that this theory of liability gives rise to a duty only in limited circumstances. Budgetary oversight alone is insufficient, as is a parent company's commission of acts consistent with its investor status.

If there is sufficient evidence to show that a parent corporation directed or authorized the manner in which an activity is undertaken, however, a duty arises. Specifically, the duty to utilize reasonable care in directing or authorizing the manner in which that activity is undertaken. Accordingly, a parent corporation can be held liable if, for its own benefit, it directs or authorizes the manner in which its subsidiary's budget is implemented, disregarding the discretion and interests of the subsidiary, and thereby creating dangerous conditions. In such situations, parent-defendants will not be protected by the exclusive remedy provision of the Workers' Compensation Act.

For these reasons, we affirm the appellate court's reversal of the trial court's grant of summary judgment and its remand of the cause to the circuit court for further proceedings.

*Affirmed.*

CHIEF JUSTICE THOMAS and JUSTICE KILBRIDE took no part in the consideration or decision of this case.

JUSTICE FREEMAN, specially concurring:
Our ruling today, for the first time, recognizes that direct

-19-

participant liability is a valid theory of recovery under Illinois law. We also find that, on the specific record presented in this case, the trial court erred in granting defendant, Clark USA, Inc., summary judgment on plaintiffs' direct participant liability claims. I am in agreement with the ultimate result reached by the majority opinion. I write separately, however, to offer additional reasons in support of the reversal of summary judgment in this matter.

In March 1995, plaintiffs' decedents were killed in a fire which followed an explosion occurring at their workplace, a refinery located in Blue Island. The refinery is owned and operated by decedents' employer, Clark Refining & Marketing, Inc. (Clark Refining). Defendant, Clark USA, Inc., owns 100% of the stock of Clark Refining. Plaintiffs allege that the fatal fire started when untrained operators, who were not maintenance mechanics, performed maintenance tasks and disassembled a valve which, instead of being drained of flammable materials, was still pressurized. As a result, these materials escaped and burst into flames. Decedents were eating in a lunchroom located in the maintenance building at the refinery across an access road from the maintenance work, and the explosion and subsequent fire trapped and killed them before they could escape the building.

Subsequent to the accident, plaintiffs filed suit, naming Clark Refining's parent company, Clark USA, Inc., as a defendant based upon the theory of direct participant liability for controlling the budget of its subsidiary in such a way that directly led to the workplace accident and, ultimately, to the death of decedents. Plaintiffs alleged that defendant negligently imposed an "overall business strategy" directing the subsidiary to minimize costs and capital investments, which allegedly caused the subsidiary to engage in the dangerous practice of reducing training and maintenance. According to plaintiffs, as a result of this direct interference by the parent company, untrained operators were assigned to perform dangerous maintenance tasks at the plant. This occurred, plaintiffs contend, because there was a large maintenance backlog caused by economic cutbacks specifically dictated and directed by defendant in order to increase its own profits.

During the course of this lengthy litigation, the parties have engaged in an extensive amount of discovery, including the exchange

-20-

of countless business records as well as the taking of depositions of numerous individuals with knowledge of the events that occurred prior, during and after the time of the accident. Indeed, the appellate record in the instant matter exceeds 60 volumes and reaches nearly 15,000 pages. Two weeks before this cause was set for jury trial, the circuit court of Cook County granted defendant summary judgment pursuant to section 2–1005 of the Code of Civil Procedure (735 ILCS 5/2–1005 (West 2002)). The trial court's order granting summary judgment, however, stated only that defendant's motion was granted and contained no specific findings by the trial court to indicate the basis for its ruling.

It is in this procedural posture that the instant cause comes to us on appeal. We must, therefore, review the ruling of the circuit court to determine whether, under the specific facts and circumstances of this case, the circuit court erred in granting defendant summary judgment. The standards used to determine the propriety of a grant of summary judgment are familiar and well settled. The purpose of summary judgment is not to try a question of fact but, rather, to determine whether a genuine issue of material fact exists. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004). The entry of summary judgement is appropriate only where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2–1005(c) (West 2004).

In determining whether a genuine issue of material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent. *Bagent v. Blessing Care Corp.*, No. 102430, slip op. at 6 (January 19, 2007). A triable issue precluding the entry of summary judgment exists where the material facts are disputed or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts. *Bagent*, slip op. at 6. Although summary judgment can aid in the expeditious disposition of a lawsuit, it is nevertheless a drastic means of disposing of litigation and, therefore, should be allowed only where the right of the moving party is clear and free from doubt. *Adams*, 211 Ill. 2d at 43 (and cases cited therein).

It is with these standards in mind that we hold today that the trial court improvidently granted defendant summary judgment. We have carefully reviewed the vast amount of evidence adduced by plaintiffs in opposition to defendant's motion for summary judgment. Various business documents generated by defendant and/or its subsidiary, coupled with the deposition testimony of several individuals familiar with events transpiring prior, during and subsequent to the accident, raise numerous genuine issues of material fact as to whether defendant, through its direct control of Clark Refining, negligently caused the maintenance and training of employees at the Blue Island facility to degrade to such a level that safe operation of the plant became impossible, ultimately leading to the fatal accident in this case.

At this juncture, I underscore that our opinion today does not alter the bedrock principle of limited liability for corporate shareholders,[1] and that direct participant liability is a very narrow exception to this general principle. Today's decision stands for the proposition that if a parent company merely articulates general policies and supervises a subsidiary's budgeting decisions, such conduct alone is not enough to give rise to direct liability on the part of the parent. In other words, conduct that is entirely "consistent with the parent's investor status" does not pose a problem. *United States v. Bestfoods*, 524 U.S. 51, 69, 141 L. Ed. 2d 43, 62, 118 S. Ct. 1876, 1889 (1998). Thus, activities by the parent company that involve the subsidiary, such as "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures," will, generally, not give rise to direct liability. *Bestfoods*, 524 U.S. at 72, 141 L. Ed. 2d at 62, 118 S. Ct. at 1889. The "critical question" in deciding whether the parent company can be held liable under a theory of direct participant liability is "whether, in degree and detail, actions directed to the

---

[1]As the United States Supreme Court observed in *United States v. Bestfoods*, "it is hornbook law that 'the exercise of the "control" which stock ownership gives to the stockholders ... will not create liability beyond the assets of the subsidiary.' " *Bestfoods*, 524 U.S. at 61-62, 141 L. Ed. 2d at 56, 118 S. Ct. at 1884, quoting W.O. Douglas & C. Shanks, *Insulation from Liability Through Subsidiary Corporations*, 39 Yale L.J. 193 (1929).

[subsidiary] by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility." *Bestfoods*, 524 U.S. at 72, 61-62, 141 L. Ed. 2d at 62, 118 S. Ct. at 1889. Throughout these proceedings, defendant has voiced the valid concern that the direct participation liability theory of recovery must not be stretched to such an extent that it encompasses routine and proper exercises of shareholder control, lest the exception swallows the general rule and serves to spawn a flood of lawsuits against parent companies. I agree with defendant on this point, and our opinion today preserves the proper balance between the general rule and this narrow exception.

In addition, defendant has voiced concern that it could be held liable under the direct participant theory simply because it shares its officers and directors with its subsidiary. Our opinion today guards against such a result, as it recognizes the principle that "it cannot be enough to establish liability [under a direct participation theory] that dual officers and directors made policy decisions and supervised activities at the facility." *Bestfoods*, 524 U.S. at 69-70, 141 L. Ed. 2d at 61, 118 S. Ct. at 1888. This is true because when an individual wears two "hats"–*i.e.*, as an officer and/or director of both the parent and the subsidiary companies–a court will "generally presume 'that the directors are wearing their "subsidiary hats" and not their "parent hats" when acting for the subsidiary.' " *Bestfoods*, 524 U.S. at 69, 141 L. Ed. 2d at 61, 118 S. Ct. at 1888, quoting P. Blumberg, Law of Corporate Groups: Procedural Problems in the Law of Parent & Subsidiary Corporations §1.02.1, at 12 (1983). In other words, a parent company will generally not be found liable for decisions made by a subsidiary's board and/or officers simply because these individuals are also officers or directors of the parent company. Rather, liability will result only in instances where the conduct complained of occurred while the officers/directors were acting in their capacity as officers/directors of the *parent*, rather than of the subsidiary. As the court in *Bestfoods* explained: "the presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless

advantageous to the parent." *Bestfoods*, 524 U.S. at 70 n. 13, 141 L. Ed. 2d at 61 n.3, 118 S. Ct. at 1888 n.3.

It should be emphasized that rarely will a parent company that generally observes corporate formalities step outside the proper role of a parent to so pervasively interfere with the operations of the subsidiary that it can be viewed as directly inflicting harm on the subsidiary's employees or third parties doing business with the subsidiary. In the matter before us, however, plaintiffs have presented sufficient evidence of conduct by defendant to create a genuine issue of material fact as to whether that conduct could not only be deemed "eccentric under accepted norms of parental oversight" of a subsidiary's business (*Bestfoods*, 524 U.S. at 72, 141 L. Ed. 2d at 62, 118 S. Ct. at 1889), but also "plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent" (*Bestfoods*, 524 U.S. at 70 n.13, 141 L. Ed. 2d at 61 n.13, 118 S. Ct. at 1888 n.13), to the extent that it could serve as a predicate for direct participant liability on the part of defendant.

First, the record contains several business documents which raise a genuine issue of material fact with respect to the nature and extent of direct involvement by defendant in the affairs of its subsidiary, Clark Refining. As background, I note that throughout the time period at issue in this matter, defendant and Clark Refining had largely (although not entirely) overlapping boards of directors, which often held joint meetings. In addition, the President and Chief Executive Officer of defendant, Paul Melnuck, was also the President, Chief Executive Officer (CEO) and Chief Operating Officer (COO) of Clark Refining. As further background information, I note that, in his deposition, Melnuk testified that he had no previous experience in the oil refining business, and that he concentrated on the financial aspects of the business. Melnuck further stated in his deposition that defendant had no operations personnel, and that its function was to simply serve as a holding company.

It is against this background that we have reviewed the following business records. For example, plaintiffs point to a business record entitled "Clark USA Liquidity Overview." This document is part of the agenda for the Clark USA, Inc., February 15, 1995, board of directors meeting, and commands that the "1995 philosophy is survival mode," and that the "goal is to replenish the strategic cash

reserve to $200 million." This goal was to be accomplished through "reduced capital spending," "reduced working capital investment," and "reduced operating expense level."

Defendant's continued focus on this financial goal is reflected in a document entitled "Interoffice Memorandum," which is dated April 19, 1995, from Paul Melnuk to the "Executive Committee" regarding an "EC Meeting" to be held the following week. As part of this memo, Melnuk included as attachments documents entitled "Clark USA, Inc. 1995 Imperatives April 1995," "Clark USA, Inc. 1994 Performance Distribution Grade Level 13 and Above," and "Clark USA, Inc. Scorecard First Quarter, 1995." In the 1995 "Imperatives" document, focus was placed upon replenishing Clark USA Inc.'s strategic cash reserve of $200 million by reducing the capital spending at the Blue Island refinery to the "minimum sustainable level." In the "Scorecard" document, "key achievements" were listed to include "cash balance" and "1995 Imperatives," whereas key disappointments were listed to include "performance management," "employee morale/lack of leadership," "short-term thinking," and "Blue Island tragedy."

These documents create, in several respects, genuine issues of material fact that preclude entry of summary judgment. First, although defendant has asserted that it is a mere holding company, the "Interoffice Memo" contains documents which, on their face, deal with Clark USA, Inc., matters, and the memo itself is directed to the "Executive Committee." The existence of an executive committee for Clark USA, Inc., however, would run counter to defendant's argument that it is merely a holding company and has no operating personnel. During his deposition, Melnuk acknowledged the words as they are written in the memo, and specifically, in the attachment entitled "Clark USA, Inc. 1995 Imperatives." Melnuck, however, offered another, alternative reading of these words, stating: "The words on this page as you read them are the words as you read them. These are actually, in fact, the 1995 Imperatives of Clark Refining and Marketing, Inc., and in this regard *the title on this page is incorrect*." (Emphasis added.) Similarly, with respect to the attachment to the memo entitled "Clark USA, Inc. Scorecard First Quarter, 1995," Melnuk testified in his deposition that although the title states "Clark USA," this document "is in fact a score card of the

business of Clark R[efining] and M[arketing]," again contending that the title of the document was "incorrect." At a minimum, these differing interpretations of the language of these documents and their contents create a genuine issue of material fact precluding entry of summary judgment.

In addition, plaintiffs assert that these documents create a genuine issue of material fact as to whether defendant's mandated budget cuts were targeted to reduce Clark Refining's capital spending on essential items such as safety training and maintenance. Plaintiffs contend that such commands are especially egregious and inappropriate in a refinery setting dealing with highly explosive materials, where an accident such as occurred here is foreseeable. According to plaintiff, the actions of defendant constitute precisely the type of conduct on the part of a parent company that may be considered "eccentric under accepted norms of parental oversight" (*Bestfoods*, 524 U.S. at 72, 141 L. Ed. 2d at 62, 118 S. Ct. at 1889) and "plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent" (*Bestfoods*, 524 U.S. at 70 n.13, 141 L. Ed. 2d at 61 n.13, 118 S. Ct. at 1888 n.13), to the extent that it could serve as a predicate for direct participant liability on the part of defendant.

In support of this theory, plaintiffs point to evidence that they assert shows that although defendant, through Melnuk, was aware of the negative effects of the mandated cuts on the safety, training, and maintenance at the Blue Island refinery, it nevertheless continued to require Clark Refining to comply with its dictates. For example, Ronald Anderson, a former union president at the refinery, stated in his deposition testimony that the issue of the lack of preventative maintenance at the refinery–including that employees were forced to "cut[ ] corners" with respect to maintenance and safety–was sent up the corporate chain of command, all the way to Melnuk. According to Anderson, under the direction of the "corporate office," members of the refinery's safety and environmental department worked only a daytime shift, even though the plant operated on a 24-hour basis. This meant that untrained operators were left to perform these specialized jobs during the off-shifts. In his deposition, Anderson described the situation at the plant as being one of "continuous deterioration" with respect to maintenance, safety, and training, and stated that the refinery was "falling apart." According to Anderson, Melnuck would

not provide authorization to remedy the situation, despite the fact that, as union president, he directly discussed these issues with Melnuk. Anderson also stated that flyers were posted around the refinery which discussed the financial status and competitiveness of the company, which asked for increases in production, and which pointed out that other refineries had entered into bankruptcy. Anderson testified that this created a "fear factor" at the plant, in that "people *** who generally would not compromise situations, compromised their job, were placed in a position through fear to be tempted to compromise things," meaning that they "cut corners" because they believed that otherwise "the place was going to shut down and everybody was going to lose their jobs."

Based upon this evidence, a genuine issue of material fact was raised as to whether defendant's extreme cost-cutting requirements–dictated to the subsidiary despite the knowledge that its measures resulted in a dangerous reduction in training and maintenance which adversely affected safety at the refinery–may be considered "eccentric under accepted norms of parental oversight" (*Bestfoods*, 524 U.S. at 72, 141 L. Ed. 2d at 62, 118 S. Ct. at 1889) and "plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent" (*Bestfoods*, 524 U.S. at 70 n.13, 141 L. Ed. 2d at 61 n.13, 118 S. Ct. at 1888 n.13), to the extent that it could serve as a basis for direct participant liability on the part of defendant. In addition, there is clearly a genuine issue of material fact with respect to what "hat" Melnuck was wearing during this time period when he was apprised of these safety concerns but nevertheless dictated budget cuts. I also note that, during these proceedings, defendant has not challenged plaintiffs' assertion that it knew of the potential danger at the refinery due to its business plan.

In addition, plaintiffs also rely upon the deposition testimony of Terence Quirke, an economics planning engineer at the Blue Island refinery, to withstand defendant's summary judgment motion. Quirke testified with respect to the development and implementation of operating budgets at the Blue Island facility. According to Quirke, Melnuk–the president, CEO and COO of both defendant and its subsidiary–was personally and actively involved in creating and implementing operating budgets at the plant. According to Quirke, starting in 1993 management implemented a "zero based budget"

approach that took into account the actual costs of each item and operation in detail.

According to Quirke, he and colleagues at the refinery established a working budget and assumed that it would be approved by management. Quirke testified, however, that he was informed that "Paul Melnuck had said that the budget was too much." Quirke then inquired about what items needed to be cut, and he was told that the budget had to be reduced by 25%. In response, Quirke compiled a list of items that could and could not be cut. The bulk of the expenditures at the refinery were nondiscretionary–including raw materials and utilities that were necessary to operate the plant. The remaining 20% of the costs were controllable, including employee wages, benefits, education, training, repairs, and equipment maintenance. According to Quirke, the only choice in complying with the requirement to reduce costs by 25% was to cut the controllable costs within the budget. According to Quirks's deposition testimony, this was explained to Melnuk, and, eventually, the budget with these reductions was approved. Quirke testified that, as a result of the mandated budget cuts, several troubling events occurred at the refinery, including 20 workers being replaced with 6 in one department, and new operator training and refresher training being entirely eliminated.

According to plaintiffs, when defendant ordered the budget cuts at the Blue Island refinery, it knew that safety, training, staffing, education and maintenance would all be compromised, and, accordingly, it was foreseeable that injury would occur as a result. Plaintiffs further contend that the record reflects that the subsidiary had no decision in this reduction. Finally, plaintiffs point to Clark Refining's own internal investigation of the accident, which cited a lack of training, maintenance and safety as having played a causative role.

Accordingly, in light of the evidence presented by plaintiffs, a genuine issue of material fact has been raised with respect to whether defendant merely established parameters or financial goals for its subsidiary. The evidence raises a question as to whether defendant actively mandated aggressive cuts in its subsidiary's budget knowing that these cuts could only be accomplished by dramatic reductions in maintenance, training and safety. Moreover, the evidence raises a

question with respect to the forseeability of injury, as it appears that defendant had several opportunities, after ordering drastic budget reductions and observing their negative effects, to change course but did not. This conduct raises material questions of fact as to whether defendant's actions fall within the direct participant liability doctrine.

In sum, our opinion today recognizes a very narrow exception to the general rule. I underscore the procedural posture of this case: it is here on a review of a grant of defendant's motion for summary judgment. In assessing the circuit court's ruling, we construe, as we must, all evidence strictly against the movant–defendant–and liberally in favor of the opponent–plaintiffs. With our opinion today, this court only determines that plaintiff adduced sufficient evidence to withstand defendant's motion for summary judgment. The decision today should not be interpreted as indicating or telegraphing whether plaintiffs will ultimately succeed on the merits of this cause of action. That is a question for the trier of fact to decide at trial.

JUSTICE BURKE joins in this special concurrence.