Kaplan, Mitchell H., J.

INTRODUCTION

The plaintiff, Jeffrey Born, was seriously injured in a workplace accident while employed by Wyman-Gordon Company. Born applied for and received workers’ compensation benefits as a result of the accident. He filed this action to recover damages for the injuries he sustained from defendants involved in the design and manufacture of the equipment with which he was working at the time of the accident[2] and from defendant Precision Castparts Corp. (“PCC”), which is the parent corporation of Wyman-Gordon. As to PCC, Born asserts that it is liable to him under a theoiy of “direct participant liability” pursuant to which a parent corporation may be liable to an injured worker for a workplace injuiy sustained while working for its subsidiary company, if it directly participated in activities that negligently caused the accident. There appear to be no Massachusetts cases addressing this theoiy of liability. This case is now before the court on PCC’s motion for summary judgment. For the reasons set forth below, PCC’s motion is ALLOWED.

BACKGROUND

The undisputed facts and the disputed facts viewed in the light most favorable to Born, the non-moving party, are as follows.

I. The Accident

The accident that gives rise to this case occurred on April 24, 2003. For many years prior to that date, Bom was employed by Wyman-Gordon in the Stock Cutting Department of its North Grafton, Massachusetts plant. On April 24, 2003, Born was injured while loading metal stock weighing several thousand pounds onto a conveyor system that was a part of a “Forte” saw, so that the stock could be cut. The stock fell off the conveyor, crushing Born’s feet. Bom required a double amputation. Born was loading the stock in the output side of the saw, as the input conveyor system was broken. The saw was frequently broken, and the conveyor system was often run in reverse. There is evidence that Born considered this practice dangerous and that the accident was the result of loading stock on the side of the saw designed for output rather than input of materials to be cut.

II. PCC’s Acquisition of WymanGordon and Changes in Management

On November 25, 1999, Wyman-Gordon, a Massachusetts corporation, was acquired by PCC, which continues to own all of its capital stock. The summary judgment record does not contain a schedule of the PCC family of companies, nor a personnel chart that shows the officers or directors of the parent corporation. It appears, however, that PCC has a number of subsidiaries and the PCC family of companies operate more than 125 plants, presumably through subsidiary corporations. After the acquisition, Mark Donegan (“Donegan”), PCC’s CEO and the chairman of its board of directors, became the president of Wyman-Gordon. Donegan’s office was not in Massachusetts, and there is no evidence that he visited the North Grafton plant where Born worked. Donegan personally participated in quarterly meetings with the managers of each of the plants operated by the PCC family of companies at which he reviewed twenty-six schedules that had to be prepared for each plant. A copy of the schedules is also not a part of the summaiy judgment record, but they appear to be a means of tracking the performance of each plant, both with respect to revenues and costs, as well as other items. It is a fair assumption that Wyman-Gordon did not prepare these schedules before its acquisition, as they are a PCC management tool.
*417 Following the acquisition, John Ericksen (“Ericksen”) became the vice president and general manager of Wyman-Gordon. His office was in Millbury. He was responsible for the operations of Wyman-Gordon plants in Worcester and North Grafton (where the accident occurred). Ericksen reported to Donegan. The record does not reflect whether Ericksen was also an officer of PCC. Prior to the acquisition, Ericksen ran a different PCC subsidiary.
Jim Wilbur (“Wilbur”) was the operations manager of the North Grafton plant at the time of the accident. Wilbur had been recruited by PCC to manage this plant. It appears that he was working for an unrelated company prior to going to work for Wyman-Gordon, although he had worked for a PCC company at some point in the past. The summary judgment record does not suggest that any other senior managers of the North Grafton plant were added by PCC after the acquisition. In particular, Born’s foreman was not a new hire, nor was the person to whom that foreman reported, who in turn reported to Wilbur.

III. Budgets and Reports

At some time after the acquisition, PCC altered the manner in which Wyman-Gordon accounted for its costs and reported on the results of its operations. Wyman-Gordon had previously tracked its production costs and product output on a monthly basis. PCC instituted a system that generated a so-called “P&L” report daily. Lawrence McGee (“McGee”), a long-time employee ofWyman-Gordon and the manager of maintenance at the time of the accident, described the differences in the reporting systems. The daily P&L report permitted all employees to monitor performance of their unit on a daily basis, instead of limiting distribution of this information to managers and making it available only monthly. McGee described an operating philosophy that PCC employed called a “Theoiy of Constraints.” Born’s argument on this point appears intended to convey the impression that “constraints” refers to constraint as to how much WymanGordon could spend on production costs, e.g., maintenance or safely. In fact, there is very little information in the record as to what the Theoiy of Constraints actually is or was, or how it affected operations, but there is certainly nothing in the record that suggests that it directed Wyman-Gordon to reduce expenditures on maintenance or safety. To the contrary, to the extent that the record provides any description of the theory’s purpose, it appears to be a means of minimizing bottlenecks in the manufacturing process that may “constrain” output.
In fact, Wyman-Gordon continued to set its own operating budget after the acquisition: “the decision-making on budgets and maintenance is done at the local level.” Born makes much of a PCC deponent’s statement: “Are you asking did [Wyman-Gordon management] have a blank check and they could spend whatever they want and no one questioned it, no, that didn’t happen.” (Donis Dep. p. 25.) However, it is difficult to conceive of a parent/subsidiaiy relationship where the subsidiary was subject to no oversight with respect to budget or expenditures. Further, the deponent’s testimony from which this line is taken clearly states that the subsidiary “managed its money.”
PCC also instituted an accounting system in which labor costs associated with maintenance of equipment were charged back to the operating unit in which the maintenance was performed. In consequence, the costs associated with maintenance work would be reflected in the operating results of the unit. Bom speculates that this could influence a manager of a unit to defer maintenance and thereby improve profitability, at least in the short run. Born, however, offers no admissible evidence that this ever happened. Moreover, the deposition testimony in the summary judgment record that addresses equipment maintenance decisions explains that they were made at the discretion of the “operational area managers” without direction from PCC, or even from senior managers at Wyman-Gordon. Not surprisingly, the testimony was that Wyman-Gordon paid attention to maintenance costs before the acquisition. The new accounting system may well have enabled Wyman-Gordon to track more accurately where it was spending maintenance dollars, but there is no evidence that PCC directed that maintenance expenditures be reduced.
McGee also testified that he had a budget for maintenance and repairs, and it was his job to determine how he spent that budget. If he believed that he needed to exceed that budget, the expenditure required the approval of the plant manager. Wilbur was plant manager at the time of the accident. There is no evidence that Wilbur ever refused to approve such a request. In response to a direct question from Born’s counsel as to whether, after the PCC acquisition, there was a “goal ... to reduce the overall cost of machine maintenance,” McGee testified as follows: “The overall goal is to produce parts at a cheaper price. Maintenance is there to service the equipment. I don’t believe there’s any intent to reduce maintenance. As a matter of fact, they’ve hired more maintenance people to maintain things.” (McGee Dep. pp. 138-39.)[3] There is simply no evidence that PCC directed Wyman-Gordon to reduce its budget or its actual expenditures for equipment maintenance or plant safety.

TV. The Operation of the Saw

The record does contain evidence that the Forte saw was being operated in an unsafe manner in 2003. This court’s prior decision granting summary judgment to Simonds International Corporation and AB Engineering Corporation describes the manner in which the saw was operated, including that it had been significantly altered since its original installation in North Grafton in 1986, and was not being run in the manner intended by the manufacturer. Bom and another saw *418 operator, Debra Coonan, testified that they complained about the risk of operating the saw in reverse; however, their supervisor expected them to feed stock into the output conveyor system, and they did do so when the input side was broken, to keep the saw operating.[4] Coonan also testified that the practice of running the saw in reverse had started sometime in the nineties, but she could not recall the exact date on which the practice first occurred. For purposes of this motion, it is most relevant to note that there is no evidence in the record that Born, Coonan, or anyone else ever informed Donegan, Ericksen or Wilbur that the saw was being operated in an unsafe manner. And, as noted above, there is also no evidence that anyone at PCC directed that maintenance budgets generally be cut with the foreseeable effect that this type of accident could occur. Indeed, while the saw may have broken down more frequently as it aged, there is evidence in the record that it was used in much the same manner before and after the acquisition.
After Bom’s accident, OSHA cited Wyman-Gordon with a willful violation for failing to “maintain [the saw] in a condition which would ensure safe operation.” According to OSHA, operating the saw in reverse contributed to Born’s accident. Born applied for and received workers’ compensation benefits for his injuries and also filed this action.

DISCUSSION

Summary judgment will be granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commn’r of Correction, 390 Mass. 419, 422 (1983). To prevail on its summary judgment motion, the moving party must affirmatively demonstrate the absence of a triable issue, and that the summary judgment record entitles it to a judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). If the moving party does not have the burden of proof at trial, as is the case here, it may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991). “[A]ll evidentiary inferences must be resolved in favor of the [nonmoving party].” Boyd v. National R.R. Passenger Corp., 446 Mass. 540, 544 (2006).
The nonmoving party, however, cannot defeat a motion for summary judgment by merely asserting that facts are disputed. Mass.R.Civ.P. 56(e); LaLonde v. Eissner, 405 Mass. 207, 209 (1989). Rather, to defeat summary judgment the nonmoving party must “go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 714 (1991). “Conclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient.” Cullen Enters., Inc. v. Massachusetts Prop. Ins. Underwriting Ass’n, 399 Mass. 886, 890 (1987), quoting Madsen v. Erwin, 395 Mass. 715, 721 (1985).

I. Parent Company Liability

PCC maintains that summary judgment should enter because its only relationship to the tragedy that gives rise to this case is that it owns the shares of Wyman-Gordon, Born’s employer, and “[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation ... is not liable for the acts of its subsidiaries.” United States v. Bestfoods, 524 U.S. 51, 61 (1998); see also, G.L.c. 156D, §6.22(b) (“[A] shareholder of a corporation shall not be personally liable for the acts or debts of the corporation . . .”). Born contends that there is evidence in the summary judgment record that could support a finding of liability on the part of PCC under the theory of direct participant liability adopted by the Illinois Supreme Court in Forsythe v. Clark USA, Inc., 224 Ill.2d 274 (2007).
Before turning to Forsythe, it is useful to point out certain theories of parent corporation liability that Born has expressly stated he is not relying upon. Bom does not argue that PCC can be liable for WymanGordon’s alleged negligence on grounds that the corporate separateness of the two corporations can be disregarded, i.e. the corporate veil pierced, under the principles announced in My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614 (1968), and its progeny. Born also does not contend that PCC assumed a duty to protect him from unsafe conditions “by affirmatively undertaking to provide a safe working environment at the subsidiary.” Muniz v. National Can Corp., 737 F.2d 145, 148 (1st Cir. 1984). Born rather relies expressly on the theory of parent corporation liability for a worker’s injury addressed in Forsythe — a theory that apparently has not so far been considered by a Massachusetts court.
In Forsythe, the plaintiffs decedent died in a fire at an oil refinery where he worked. Plaintiff alleged that the fire was the result of maintenance work performed by untrained employees not qualified to undertake the repairs. The refinery was owned and operated by a subsidiary of the defendant. On appeal of an order of the trial court granting the defendant’s motion for summary judgment, the Illinois Supreme Court reversed and held that “direct participant liability is a valid theory of recovery under Illinois law.” It explained the elements of such a claim as follows:
Where there is evidence sufficient to prove that a parent company mandated an overall business and budgetary strategy and carried that strategy out by its own specific direction or authorization, surpassing the control exercised as a normal incident of ownership in disregard for the interests of the *419 subsidiaiy, that parent company could face liability. The key elements to the application of direct participant liability, then, are a parent’s specific direction or authorization of the manner in which an activity is undertaken and foreseeability. If a parent company specifically directs an activity, where injury is foreseeable, that parent could be held liable. Similarly, if a parent company mandates an over all course of action and then authorizes the manner in which specific activities contributing to that course of action are undertaken, it can be liable for foreseeable injuries. We again stress, though, that allegations of mere budgetary mismanagement alone do not give rise to the application of direct participant liability.
Forsythe, 224 Ill.2d at 290 (emphasis in original).
The Illinois Court then went on to consider the record evidence of parent company direction of the acts of its subsidiaiy. It focused on the acts of the president of the subsidiaiy, who was also president of the defendant company. It noted that the president directed that subsidiaries needed to operate in a “survival mode” which would be “marked by ‘reduced capital spending,’ ‘reduced working capital investment,’ and ‘reduced operating expense level.’ ” In particular, the president stated that the goal of these reductions “was to replenish cash balance to 200 million.” The court held that there was a genuine issue of fact in the summaiy judgment record as to whether the president was wearing the hat of the president of the subsidiary or of the parent corporation when he issued these directives. It went on to hold that: “If [the president], acting on behalf of defendant, directed or authorized the manner in which the budget cuts in this case were taken, he had a duty to do so in a nonnegligent way.” Id. at 295.
In reaching its conclusion that direct participant liability was a viable cause of action, the Illinois Supreme Court substantially relied on Justice Souter’s decision in United States v. Bestfoods, 524 U.S. 51 (1998). At issue in Bestfoods was, inter alia, whether a parent corporation that actively participated in, and exercised control over, the operations of a subsidiary’s facility could be liable for clean-up costs under the federal CERCLA program, 42 U.S.C. §9601 et seq. The Supreme Court concluded that CERCLA did not alter general jurisprudence regarding instances in which a parent could be directly liable for acts undertaken by or through a subsidiaiy. It then went on to describe the kind of conduct that might give rise to parent corporation liability under CERCLA.:
the acts of direct operation that give rise to parental liability must necessarily be distinguished from the interference that stems from the normal relationship between parent and subsidiaiy. Again norms of corporate behavior . . . are crucial reference points. Just as we may look to such norms in identifying the limits of the presumption that a dual officeholder acts in his ostensible capacity, so here we may refer to them in distinguishing a parental officer’s oversight of a subsidiary from such an officer’s control over the operation of the subsidiary’s facility. Activities that involve the facility but which are consistent with the parent’s investor status, such as monitoring of the subsidiary’s performance, supervision of the subsidiary’s finance and capital budget decisions, and articulation of general policies and procedures should not give rise to direct liability . . . The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.
Id. at 71 (internal citations omitted).
This court has some unease as to whether the Illinois Supreme Court fairly applied the teaching of Bestfoods, in adopting its theoiy of direct participant liability and applying it to the summaiy judgment record in Forsythe. In this court’s view, the Illinois Supreme Court rested its decision heavily on the two-hat-wearing president’s direction that operational budgets must be cut to survival mode, without direct evidence that he directed or knew that this would result in unsafe reductions in expenditures for safety, maintenance and training, as plaintiff alleged. However, in the instant case whether the court applies the standards for direct participant liability set out in Forsythe, or the general rule of parent corporation liability described in Bestfoods, the result will be the same.[5]

II. Claims of Direct Participation A. Management

Born first contends that by appointing Donegan as the president of Wyman-Gordon, Ericksen as its executive vice president and general manager, and Wilbur as the operations manager of the North Grafton plant, PCC exercised direct control over Wyman-Gordoris operations. Born, however, can cite no case where the appointment of a subsidiaiy’s most senior officers gave rise to parent corporation liability. In this case, there is not even any evidence that Wyman-Gordon’s previous senior management wished to stay on after the acquisition, or that Ericksen or Wilbur were also officers or directors of PCC. But even more fundamentally, there has long existed a “well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiaiy can and do ‘change hats’ to represent the two corporations separately, despite their common ownership ... Since courts generally presume that the directors are wearing their ‘subsidiary hats’ and not their ‘parent hats’ when acting for the subsidiaiy... it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility.” (Internal citations and quotations omitted: brackets in original.) Bestfoods, 524 U.S. at 70. If holding dual positions is insufficient to establish liability, then an officer simply being appointed by the parent corporation is certainly also insufficient. Clearly, a finding that a parent corporation becomes a direct participant in the acts of its subsidiaiy, if it appoints the *420 subsidiary’s most senior managers, is inconsistent with basic principle of corporate law that recognizes parent and subsidiary as distinct legal entities.
Bom also argues that the level of supervision exercised by Donegan over Wyman-Gordon was so detailed and active as to be “eccentric.” However, the only “eccentric” activity to which Born points is Donegan’s quarterly meetings with each plant manager at which he reviewed the twenty-six schedules of operations; and such monitoring and supervision of subsidiaries’ operations, finances and budgets is precisely the type of activity that is to be expected by a corporate parent. See id. at 72.
B. Budget and Production Policies and Practices
Born argues that PCC’s control over WymanGordon’s budget is also evidence tending to establish direct participant liability. There are two problems with this argument: one legal and one factual. First, in Forsythe, the Illinois Supreme Court expressly noted that “allegations of mere budgetary mismanagement alone do not give rise to the application of direct participant liability.” 224 Ill.2d at 290. And, as noted above, this point was also emphasized by the Supreme Court in Bestfoods. Additionally, Bom is unable to point to any evidence in the record that PCC directed Wyman-Gordon to mismanage its budget. To the contrary, the evidence is that budget decisions were made at the subsidiary level. Although undoubtedly subject to review by PCC, there is no evidence in the record that PCC overrode decisions at the Wyman-Gordon level, let alone directed that its operating and capital investment budget be slashed so severely that it was foreseeable that safety and maintenance accounts would be drastically reduced and worker safety would be compromised. It was very substantial evidence of just that kind that informed the Illinois Supreme Court’s reversal of summary judgment in Forsythe.[6]
Bom also argues that the practice of charging back maintenance costs to the department in which the equipment requiring maintenance or repair is operated (and the preparation of daily P&L reports) could have the effect of influencing department managers to defer maintenance. However, as noted above, the summary judgment record contains no admissible evidence that this ever happened. But more to the point, direct participant liability ought not be based on the parent corporation directing its subsidiary to use better management tools and metrics so that management of both parent and subsidiary can better understand which operations are profitable and which are expensive. Simply stated, there is no evidence in the summary judgment record that PCC directed that Wyman-Gordon engage in any act that would foreseeably result in an unsafe working condition such that it can be said to have breached a duty owed by it directly to Born.[7] Evidence that a saw was operated at WymanGordon in a hazardous manner is quite simply not evidence that the parent corporation directed the subsidiary to engage in unsafe practices. If direct participant liability exists under Massachusetts law, it does so only when the parent engages in “eccentric” control over the facilities of the subsidiary and thereby foreseeably causes an unsafe working condition.

ORDER

For the foregoing reasons, PCC’s motion for summary judgment is ALLOWED. As PCC is the only remaining defendant, judgment shall enter dismissing the case.

This court (Roach, J.) granted defendants AB Engineering Company’s and Simonds International Corp.’s motions for summary judgment, and Bom’s claims against them have been dismissed.

Apparently, at some time, Wyman-Gordon had two full-time machine maintenance personnel (“millwrights”) who worked exclusively in the Stock Cutting Department. Steven Bagdis testified at deposition that he was the only millwright in the department between 1998 and 2000, and that he did not know if this position was filled when he left. In theory, the new accounting system may have created a disincentive to employ full-time millwrights in a given department, because the department would be charged for forty hours of labor per week for those employees, even when they did not perform forty hours of maintenance work. There is no evidence in the record that even if a full-time millwright was not assigned to the Stock Cutting Department in 2003, the equipment was not maintained in the same fashion as it had been prior to the acquisition. In fact, there is testimony that there may not have been a millwright assigned to the Department during periods both before and after the acquisition. (Caputo Dep. p. 44.)

Born testified that he would come in to begin his shift and the saw would already be set up to operate in reverse. There is some indication in the record that the in-feed side of the saw had been broken for more than a year prior to Born’s accident, although there is also evidence that it was repaired as late as November 2002. There is also indication that it operated more efficiently when the stock was fed from the output side, although with greater risk.

The court therefore also need not address the questions, answered affirmatively by the Illinois Supreme Court, but apparently not addressed by a Massachusetts court: (1) if a parent corporation expressly directs that budgets for safety and maintenance be reduced to unsafe levels does it breach a duty owed directly to the subsidiary’s employee, and (2) does the parent then lack the immunity to suit provided the subsidiary under the workers’ compensation laws? See, G.L.c. 152, §24.

The concurring opinion in Forsythe emphasized “that direct participant liability is a very narrow exception to . . . the bedrock principle of limited liability for corporate shareholders,” and that the Court “reviewed the vast amount of evidence adduced by plaintiffs . . . [that] raise[d] numerous genuine issues of material fact as to whether defendant, through its direct control of [its subsidiary], negligently caused the maintenance and training of employees at the .. . facility to degrade to such a level that safe operation of the plant became impossible, ultimately leading to the fatal accident in this case.” Id. at 302.

Although not necessary to the court’s ruling, the summary judgment record also does not contain evidence that Donegan, Erickson or Wilbur were informed about the manner in which the Forte saw was being operated, or for that matter that the saw was not run in reverse until after the acquisition.